J. Donald **SILVA**

v.

The **UNIVERSITY OF NEW HAMPSHIRE,** et al.

**Civ. No. 93–533–SD.**

United States District Court, D. New Hampshire.

Sept. 15, 1994.

Paul McEachern, Michael P. McDonald, Portsmouth, NH, for plaintiff.

Jack B. Middleton, Manchester, NH, for defendant.

## ORDER

DEVINE, Senior District Judge.

Plaintiff J. Donald Silva, an Instructor of Communications at the Thompson School of Applied Science at the University of New Hampshire (UNH or the University) and a tenured member of the UNH faculty, brings this action pursuant to 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. §§ 1983 and 1988, and New Hampshire law, against defendants UNH; Dale Nitzschke, President of UNH;[1] Dr. Brian A. Giles, Director of the Thompson School; Neil B. Lubow, Associate Vice President for Academic Affairs at UNH; Mary M. Clark, Professor of English at UNH and member and chair of the UNH Sexual Harassment Appeals Board which adjudicated Silva's case ("Appeals Board"); Elizabeth Dolan, Associate Professor at UNH and member of the Appeals Board; Stephen Fink, Professor at UNH and member of the Appeals Board; and Shannon Cannon and John Denning, students at UNH and members of the Appeals Board.

Silva seeks (1) a declaratory judgment that the defendants' conduct violates his right to freedom of speech under the First and Fourteenth Amendments; (2) a declaratory judgment that the defendants' conduct denies Silva his civil rights under color of state law in violation of section 1983; (3) a permanent order enjoining defendants from acting to prevent Silva from teaching at UNH or from otherwise punishing him on the basis of protected speech; (4) damages under section 1983 for the alleged violation of Silva's First Amendment right to freedom of speech and his Fourteenth Amendment right to due process; (5) damages under New Hampshire law based on allegations of breach of contract and breach of a contractual duty of good faith and fair dealing; and (6) an award of reasonable costs and attorneys' fees pursuant to section 1988.

Presently before the court are plaintiff's motion for a preliminary injunction, to which defendants object, and defendants' motion for summary judgment,[2] to which plaintiff objects.

---

1. The court notes that Nitzschke has recently resigned from his position as President of UNH.

2. Defendants' motion for summary judgment was originally filed as a motion to dismiss, with attached evidentiary submissions. In its order of January 13, 1994, this court notified the parties that pursuant to Rule 12(b), Fed.R.Civ.P., said motion would be treated as a Rule 56 motion for summary judgment.

An evidentiary hearing on plaintiff's motion for a preliminary injunction was held on September 12, 1994. At said hearing, the parties each made offers of proof based on the voluminous record before the court on defendants' motion for summary judgment. In addition, Silva and defendant Lubow testified at said hearing.

*Factual Background*

The University System of New Hampshire [USNH] Sexual Harassment Policy states:

*SEXUAL HARASSMENT*

All faculty, staff and students have a right to work in an environment free of discrimination, including freedom from sexual harassment. It is the policy of the University System of New Hampshire that no member of the University System community may sexually harass another. The intent of this policy is not to create a climate of fear but to foster responsible behavior in a working environment free of discrimination.

Unwelcome sexual advances, requests for sexual favors and other verbal or physical conduct of a sexual nature constitute sexual harassment when:

—such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating a hostile or offensive working or academic environment.

—submission to or rejection of such conduct by an individual is used as the basis for employment or academic decisions affecting that individual.

—submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment or academic work. (Section 1604.11 of the EEOC's Guidelines on Sexual Discrimination)

Examples of conduct which may, if continued or repeated, constitute sexual harassment are:

—unwelcome sexual propositions

—graphic comments about a person's body

—sexually suggestive objects or pictures in the workplace

—sexually degrading words to describe a person

—derogatory or sexually explicit statements about an actual or supposed sexual relationship

—unwelcome touching, patting, pinching or leering

—derogatory gender-based humor

Such conduct whether intended or not constitutes sexual harassment and is illegal under both State and Federal law. Violations of this policy will not be permitted. Any faculty, staff or student who violates this policy will be subject to discipline up to and including dismissal.

Plaintiff's Memorandum of Law in Opposition to Summary Judgment, Exhibit 1 (Affidavit of John E. Mulhern, Jr.), Enclosure # 3.

In February of 1992, Silva was teaching a course in technical writing entitled Communications 212. The course is designed to train students to develop skills in technical reporting. In describing his pedagogical approach during the first class session at issue, Silva states,

I compared focusing the thesis statement of a technical report with the sexual relationships between persons and how familiarity and experience are part of the communication, if focus is to occur. This comparison was on an intellectual plane and the purpose was to relate an abstract concept to everyday experiences most students are familiar with....

Focusing is the second stage of the writing process after collecting information. Focusing on the central idea of a long technical report is a complex task for freshm[e]n in their second semester. The relationship of the writer to her subject must have intimacy and proximity similar to the sexual relationship between people.

Focusing requires the same long probation, adjustment, centering, a back and forth, give and take relationship until the writer and the subject are connected and fused as one. The experience is the writer, the writer is the experience. It is only as every aspect of the technical writing situation is united and connected that it can be said to have a focus. The tradition-

al definition is to say, the report has a thesis statement, but focus is much more than an abst[r]action at this stage of the process. Focus objectifies the personal experience, the act of fusion into language of the careful observations made by the writer.

Letter of April 30, 1992, from J. Donald Silva to Dr. Brian Giles at 2 (Silva Deposition, Exhibit 7).

On February 24, 1992, Silva made the following statement to his technical writing class,

> I will put focus in terms of sex, so you can better understand it. Focus is like sex. You seek a target. You zero in on your subject. You move from side to side. You close in on the subject. You bracket the subject and center on it. Focus connects experience and language. You and the subject become one.

Complaint at 8.

Two days later, during the second technical writing class session at issue, Silva employed the following pedagogical approach.

> I used Little Egypt's definition of belly dancing to illustrate how a good definition combines a general classification (belly dancing) with concrete specifics in a metaphor (like jello shimmying on a plate) to bring home clearly the meaning to one who wishes to learn this form of ethnic dancing.

Silva's April 30 Letter to Giles, *supra,* at 1. Specifically, Silva stated to his class, "Belly dancing is like jello on a plate with a vibrator under the plate." Complaint at 8. Silva explains,

> I used the definition to catch the attention of my class to gain their attention when they did not comprehend the explanation. . . .

> Little Egypt's definition of belly dancing is classic in its use of concrete differentia and simple metaphor, i.e. the trembling jello equates to the essential movements necessary to the dance. It is unlike the dance but also its very essence.

> . . . .

The intellectual task was to increase the student's understanding of definition and apply it in her own attempts to define concepts in her technical report, using the simple example as a model.

Silva's April 30 Letter to Giles, *supra,* at 1–2.

At the preliminary injunction hearing, Silva testified that he does not understand the relationship between the USNH Sexual Harassment Policy and the remarks he made in class.

In his affidavit, Silva states, "I had used both examples in my classes on numerous prior occasions without incident, the Little Egypt simile since the early 1970's. I considered both illustrations to have legitimate pedagogical goals." Silva Affidavit at 2. Further, at his deposition, Silva engaged in the following exchange with defendants' counsel.

Q Now, you've said a number of times that you've used Little Egypt's belly dancing/Jello vibrator statement—

A Definition.

Q —In your classroom for fourteen years?

A Yes, I've used it just about every year. Not necessarily every section of every class. At that particular time—I used it in that one section and I had two other sections but I did not use that definition. . . . I picked it up in 1972 and—

Q And how about the analogy of focus to sex; how many times had you used that in your classroom in the past?

A Well, you know, I really can't recall exactly.[3] I do know the first time I read it, something like that, was an interview with Ernest Hemingway [in] either the Paris Review or the Patern Review just before he died in the early sixties, '60 or '61. And then I read it further—I read it further with David Bartholomew—I think that's his name—who writes for The New Yorker magazine, he said a similar thing. And then another place where I read it was Ray Bradbury, the science

---

**3.** At the preliminary injunction hearing, Silva testified that he had been using the analogy of focus to sex in his classroom for a number of years.

writer, said practically exactly the same thing.

Silva Deposition at 212–13.

On the date of the belly dancing statement, six students from Silva's technical writing class met with Dr. Jerilee A. Zezula, an Associate Professor of Applied Animal Science at the Thompson School, to complain about Silva's classroom statements. Dr. Zezula's description of this meeting is in a three-page document dated February 26, 1992, entitled "Investigation: Dr. Jerilee A. Zezula." Silva Deposition, Exhibit 2–A; Silva Affidavit, Exhibit 23. The Zezula document states in part:[4]

9:40 am

Six women Animal Science students came to my office and asked if they could speak to me. They closed the door and told me some of the things that were being said in Professor Silva's technical writing class. They described how he described a "belly dancer" as being like a bowl of jello being stimulated by a vibrator, and how he used a vivid description of intercourse as an example of a type of writing. Several students then described things that were said to them as individuals during various library exercises that were personally and/or sexually offensive. They all expressed a fear of going to speak to him directly because they would never wish to be alone with him.

I agreed with them and told them that they had a very legitimate complaint and asked how far they wished to go with this. They stated that they wanted this language and behavior stopped. I told them I would discuss the problem with the Director and proceed from there. I also said that I would keep them anonymous at this time. I asked them to let me know if the behavior continued or if they sensed any reprisals from him in the future.

11:10 am

I received a phone call from Professor Silva. He said that two women students had approached him about some of the things he said in class. He said he was concerned that I might hear something about it and he wished to explain his comments to me. He told me how he used the example of the jello and the vibrator in a "definition" of a belly dancer and the example of sexual intercourse as an example of "centering" and "metaphor". He told me he felt the students were being overly sensitive about natural conversation. He said vibrators were not strictly sexual tools and that these are animal science students and should not be offended by the description of a sexual act. He also stated that about two years ago "Brian[5] came storming into my office" and forbade him from using sexual examples. He wondered if he should try to discuss it with the class.

During the conversation I took notes and asked him the names of the two students. He gave me their names. One was one of the six that had come to my office. *I did not tell him that I had already spoken with the students* but I did voice my objections to his examples. I explained that using the word mechanical "vibrator" in a definition of a "belly dancer" definitely had sexual overtones and would be offensive to women students. I told him I felt the use of sexual intercourse as an[ ] example of any thing in a technical writing course was very offensive and crude. He said that the students write technical papers on animal breeding all the time and he's not offended. I expressed the understanding that technical papers with technical, not crude, terminology is another matter. I also suggested that he read the university literature on sexual harassment very carefully because he was "treading on very thin ice."

Zezula Document at 1 (emphasis in original).

During the period from February 27, 1992, to March 2, 1992, eight written complaints were submitted by students to UNH. *See* Silva Affidavit, Exhibit 1–A through 1–H; Silva Deposition, Exhibits 2–B through 2–I (attached hereto as Appendices 1–8). Six of

---

**4.** The court notes that its partial recitation of the contents of the Zezula document does not indicate any adoption of said contents as findings of fact.

**5.** "Brian" refers to defendant Dr. Brian A. Giles, Director of the Thompson School.

the eight complaints address the subject of classroom statements made by Silva. *See* Complaint of Robyn Ferreira dated "Wednesday 27, 1992" (Appendix 1); Complaint of Kate Allen dated Feb. 28, 1992 (Appendix 2); Complaint of Kimberly S. Austin, undated (Appendix 3); Complaint of Katherine A. Brown, undated (Appendix 4); Complaint of Rachel Powers dated Feb. 27, 1992 (Appendix 6); Complaint of Holly Alverson dated Feb. 28, 1992 (Appendix 7).

Regarding classroom statements attributed to Silva, the complaints state: [6]

In Don Silva's Technical Writing class we were discussing focusing on our target for our report. When Mr. Silva started talking in a sexual manner which I thought was very inappropriated [sic] and also very affending [sic]. He said to the class that he would put it in sexual terms so we could understand it. So he said it's like going in and out, side to side, and loosening up so you could find the best target area. I really think that was uncalled for, especially from a professor. He could have used other explanations, and if he couldn't then he was better off by saying nothing at all.

Ferreira Complaint at 1 (Appendix 1 at 1).

During class we were discussion [sic] our technical reports when Don Silva made an analogy of a belly dancer, he made a vulgar, inappropriate description of a "bowl of jello and a vibrator", to describe the belly dancer.

Again discussing our technical reports, Don Silva was trying to explain another subject, and to do so he used the analogy of intercourse, "Find the target, loosen up, back and forth, side to side." These are just two of many such occurrances [sic].

Powers Complaint at 1 (Appendix 6 at 1).

I felt degraded in his class on Wednesday, 26 Feb, and disgusted on 24 Feb. I had questions about our assignment on 26 Feb, but due to his use of sex as a "focus",

I walked away rather than asked [sic] him to clarify again. I didn't want any more strange explainations [sic].

Alverson Complaint at 1 (Appendix 7 at 1).

As a non-traditional student and as a parent I am appalled at the statements made by Don Silva in the Technical Writing class on Wednesday 2/26/92. I feel that as a professor of English he could have illustrated the definition of "analysis" in a much more appropriate manner. He insinuated that every student present had first-hand knowledge of his illustration, and furthermore, that it was the only one we would understand.

Allen Complaint (Appendix 2).

I find Don Silva's constant referrals to sex offensive.

He has yet to hold a class in which he did not make a sexually suggestive, or bluntly sexual statement.

Enough people have allready [sic] stated what was said in class. I will briefly state how those statements made me feel.

I was shocked. I felt demeaned and embarassed [sic].

I am not a prude, but this is not an appropriate way for a writing teacher to communicate with his students.

I have three daughters; I would not want this man teaching them.

Austin Complaint (Appendix 3).

As a student of Don Silva's COM 212 Technical Writing class I was very offended by his sexual refferals [sic]. I was brought up in a house where sex was not something to be discussed openly and freely and it certainly was not something to be taken lightly. There are a hundred different ways to give an example of something without being sexual about it.

Brown Complaint (Appendix 4).

Two of the complaints do not refer to Silva's classroom speech. *See* Complaint of Brenda Madonna dated Feb. 29, 1992 (Ap-

---

**6.** The court notes that it does not adopt the contents of the student complaints as findings of fact. For example, to the extent the contents of the student complaints differ with the court's findings as to the contents of the classroom state- ment, stated *supra,* the court finds the complaints to be in error. The court finds, based on the evidence before it, that such errors were the inadvertent result of the group discussions which preceded the writing of the complaints.

pendix 5); Complaint of Denise Kohler and Jamalyn Brown dated Mar. 2, 1992 (Appendix 8). Rather, the Madonna complaint addresses alleged conduct "during the period of fall semester 1990," purportedly involving "encounters with Don that I felt to be powerful, aggressive, physical intimidation tactics which made me very uncomfortable," Appendix 5, while the Kohler/Brown complaint recounts an alleged January 29, 1992, incident at the Dimond Library as follows.

> My friend had gone over to ask Prof. Silva a question about an assignment. I went over to join her and to see if he could help me also. When she was done, he asked if he could help me. I said no, Im [sic] with her.
>
> As we turned to leave, he made a comment, "How long have you two been together."

Appendix 8.

### The "Informal" Sexual Harassment Complaint Procedure

On February 27, 1992, Neil Lubow[7] received a telephone call from Dr. Zezula informing him that several students from plaintiff's technical writing course "had come to her to complain about what they thought was sexual harassment on the part of Professor Silva." Deposition of Neil Lubow at 17.

The following day, Lubow met with Zezula and seven students. *See* Lubow Notes at 420 (Plaintiff's Hearing Exhibit 1). Lubow testified at the preliminary injunction hearing that at this February 28 meeting the students described the incidents they were complaining of. He further testified that the students were "very upset."

Lubow's notes from February 28, 1992, state, inter alia, "Ask Brian about alternative class instructor." Lubow Notes at 420; Lubow Deposition at 25. His notes further indicate that Lubow "[t]alked to Brian. He is looking into replacement instructor(s) for Silva. Agrees that we can't leave him in the classroom. Will meet with Silva and Staple-

ton[8] ASAP next week." Lubow Notes at 420; Lubow Deposition at 26.

The testimony of Giles at his deposition is consistent with Lubow's account of the events on or around February 27 and 28. Giles testified, inter alia,

Q Were you looking into replacements at that time?

A That's correct.

Q Did you agree that Silva could not be left in the classroom at that time?

A For this—for the purposes of the complainants, yes.

Q Had you talked to Don Silva to get his side of it at that time?

A No, I had not.

Q Were you looking for replacements at that time?

A That's correct.

Giles Deposition at 33–34.

After Lubow met with the student complainants, he scheduled a meeting with Silva. Lubow testified at the preliminary injunction hearing that when Silva called him to find out what the meeting was about, he told Silva that several of Silva's students were complaining about sexual harassment.

On March 3, 1992, plaintiff met with Lubow, Giles, and Stapleton. Plaintiff brought Deborah Watson and Ludwig Balling with him to the meeting as observers and advisors. Affidavit of Deborah Watson at 2 and Affidavit of Ludwig Balling at 2 (attached to Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment as Exhibits 14 and 15). The meeting lasted about half an hour. Silva Affidavit ¶ 5.

> Silva states that,
>
> At the March 3 meeting, I was given and confronted with, for the first time, written complaints of some of my students.... These Informal Complaints referred primarily to the two classroom statements described above, although there were references to matters that had gone on much earlier in the semester. (I had never re-

---

7. Defendant Lubow is a Professor of Philosophy and Associate Vice President of Academic Affairs at UNH.

8. Jane Stapleton is a counselor at the University's Sexual Harassment and Rape Prevention Program (SHARPP).

ceived any complaint, either orally or in writing, about these other matters before this time.) At the March 3 meeting, I was immediately asked to respond to the allegations contained in the Informal Complaints. Although there was some (albeit hardly complete) discussion of the two statements that I made *in class*, there was *no* discussion of the other statements that purportedly constituted sexual harassment. More importantly, I was given *no* time to consider my response, *no* opportunity to explain the context in which the statements had been made, and *no* opportunity to explain why the statements did not constitute sexual harassment under the University's policy. Of course, it would have been difficult for me to explain why my examples did not violate the University's sexual harassment policy at this meeting since I had not been given notice of the topic of this meeting, and had had no opportunity to examine the University's sexual harassment policy.

*Id.* ¶ 6 (emphasis in original). Silva also testified at the preliminary injunction hearing that he was only given an opportunity to say whether or not he had made the classroom statements at issue.

Following the March 3 meeting, "shadow classes" were created so that any of plaintiff's students who wanted to transfer out of his classes could do so, and plaintiff was required to make announcements to his students offering them the opportunity to transfer into one of the shadow classes. *Id.* ¶ 8; Memorandum from Giles to Silva dated March 18, 1992 (attached to Silva Affidavit as Exhibit 3). All of the complaining students transferred out of Silva's class.

Lubow's notes for the period between the March 3 meeting and the March 27 meeting state, inter alia,

3/10–3/27

—A draft of letter of reprimand is written

—Univ. feels it must act to protect students

—Hope is that both complainants & Silva will find it acceptable (middle ground between doing nothing & firing Silva)

—Students decide 4 conditions will satisfy them.

Lubow Notes at 344.

On March 27, 1992, plaintiff, again accompanied by Watson and Balling, had a second meeting with Lubow, Giles, and Stapleton. At this meeting, plaintiff was given a "draft" letter of reprimand stating, inter alia, that the students' reports of Silva's actions "have been found to be altogether credible." Draft Letter of Reprimand dated Mar. 17, 1992 (attached to Silva Affidavit as Exhibit 4). The draft further states, "Your behavior is in violation of University policy prohibiting sexual harassment (attached) and will not be tolerated." *Id.* According to Deborah Watson, this meeting "was very brief, not more than ten or fifteen minutes in all" and "[t]here was no discussion." Watson Affidavit at 3–4.

Silva testified at the preliminary injunction hearing that he asked for time to respond to the draft letter and was given until April 1, 1992. *See also* Lubow Notes at 344 ("Silva asked to have until Wed, 4/1 to respond—We agreed."). He further testified that he later asked Lubow for an extension of time, but Lubow denied his request. Silva did not respond to the draft letter by April 1, and the letter was converted into a formal letter of reprimand, dated April 1, 1992 (attached to Silva Affidavit as Exhibit 5).

*The Grievance Process*

Pursuant to the six-step grievance procedures set forth in the University's Faculty Handbook, plaintiff grieved his receipt of the formal reprimand by submitting a grievance letter to Giles. Silva Affidavit ¶ 12; Letter from Silva to Giles dated Apr. 30, 1992 (attached to Silva Affidavit as Exhibit 6). Silva's grievance was denied by Giles in a letter dated May 27, 1992. Letter from Giles to Silva dated May 27, 1992 (attached to Silva Affidavit as Exhibit 7). Giles also suspended plaintiff without pay for failing to meet the requirements for continued employment contained in the formal reprimand. Silva Affidavit ¶ 14; Letter from Giles to Silva dated June 2, 1992 (attached to Silva Affidavit as Exhibit 9).

By letter dated June 11, 1992, plaintiff appealed the denial of his grievance by Giles to Dr. Thomas P. Fairchild, Dean of the College of Life Sciences and Agriculture at UNH (Step II) (attached to Silva Deposition as Exhibit 10). As a result of plaintiff's decision to appeal the denial of his grievance at Step I, Giles subsequently put plaintiff's suspension "into abeyance until the grievance process is completed." Silva Affidavit ¶ 14; Letter from Giles to Silva dated June 22, 1992 (attached to Silva Affidavit as Exhibit 10).

Plaintiff's grievance was denied at Step II of the grievance process by Fairchild on June 25, 1992. Letter from Fairchild to Silva dated June 25, 1992 (attached to Silva Deposition as Exhibit 12). Plaintiff thereafter proceeded to Step III of the grievance process by requesting that the Faculty Grievance Committee review the process the University had followed prior to issuing the formal letter of reprimand and suspending him without pay for failure to meet the conditions set forth in that reprimand. Letter from Silva to Dr. John W. Seavey, Chairman, Faculty Grievance Committee, dated June 30, 1992 (attached to Silva Deposition as Exhibit 13).

A hearing before the Faculty Grievance Committee was held on August 18, 1992. Following this hearing, the committee found that plaintiff's "grievance has merit and a fair hearing and due process should be provided." Faculty Grievance Committee Decision at 2 (attached to Silva Affidavit as Exhibit 11 and to Silva Deposition as Exhibit 17).

Plaintiff requested mediation of the committee's decision on the ground that he would not be able to get a fair hearing. The attempted mediation was unsuccessful, and the grievance was subsequently appealed to Step IV of the grievance process. Letter from Mel Sandler, Grievance Committee Chair, to Walter F. Eggers, Vice President for Academic Affairs, dated Nov. 3, 1992 (attached to Silva Deposition as Exhibit 19).

While his grievance of the formal letter of reprimand was at Step III, the University notified plaintiff that it would not schedule him to teach any classes for the fall semester of 1992. Letter from Ronald F. Rodgers to Debra Weiss Ford re: Professor Donald Silva dated August 24, 1992 (attached to Silva Deposition as Exhibit 15).

*Initiation of "Formal" Sexual Harassment Process and Rescission of Formal Letter of Remand*

By letter dated November 12, 1992, plaintiff received notice from Giles that a formal complaint of sexual harassment had been filed against him by students of the Thompson School and that a hearing panel would be convened "to determine whether University System policy has been violated and to recommend appropriate relief and disciplinary action." Letter from Giles to Silva dated Nov. 12, 1992 (attached to Silva Deposition as Exhibit 20). Giles further stated that "[b]ecause of the Panel's responsibilities in this case, I am hereby rescinding the formal letter of reprimand and the sanctions set forth therein (reference 2). Further administrative action may be taken on the basis of the Panel's findings and recommendations. During the pendency of the formal complaint resolution process, you will not be scheduled to teach any classes." *Id.*

*Termination of the Grievance Process*

As a result of Giles's decision to rescind the April 1, 1992, formal letter of reprimand, Walter Eggers deemed it no longer necessary to hear plaintiff's grievance at Step IV. Letter from Eggers to Silva dated Nov. 13, 1992 (attached to Silva Deposition as Exhibit 22 and to Silva Affidavit as Exhibit 15). Plaintiff, disagreeing with Eggers' determination, requested that Dale Nitzschke, the University's president, hear his grievance at Step V. Letter from Silva to Nitzschke dated Nov. 25, 1992 (attached to Silva Deposition as Exhibit 26). Nitzschke declined to consider plaintiff's grievance at Step V, indicating that the proper procedure as outlined in the Faculty Handbook required plaintiff to grieve Eggers' decision not to hear the grievance about the formal letter of reprimand at Step IV. Letter from Nitzschke to Silva dated Dec. 17, 1992 (attached to Silva Deposition as Exhibit 30). Plaintiff decided at this point that "any further attempts to jump through the hoops set out for me by the

University would be of no avail," Silva Affidavit ¶ 19, and he did not pursue any further steps in the grievance process.

*The "Formal" Sexual Harassment Process*

By letter from Jane Stapleton and Neil Lubow dated November 16, 1992, plaintiff was notified that seven of the students who had filed complaints during the 1992 spring semester had requested that those complaints "be resolved under the 'Formal Complaint' section of our 'Procedures for Resolution of Sexual Harassment Complaints.'" Letter from Lubow and Stapleton to Silva (attached to Silva Affidavit as Exhibit 17). The Stapleton–Lubow letter states,

> On November 12, 1992 seven of the students who lodged complaints of sexual harassment against you last spring semester requested in writing that the complaints be resolved under the "Formal Complaint" section of our "Procedures for Resolution of Sexual Harassment Complaints" ("Procedures"). Attached are copies of the students' original written complaints, the November 12, 1992, letter from the seven students, an additional letter from Holly (Alverson) Woodhouse dated November 12, 1992, and "Procedures".

*Id.* The letter further notified plaintiff that he had five days in which to respond to the students' complaints. *Id.* The November 12 letter is signed by Rachel Powers, Holly (Alverson) Woodhouse, Kimberly S. Austin, Robyn Ferreira, Katherine A. Allen, Denise M. Kohler, and Jamalyn L. Brown. Silva Affidavit, Exhibit 18.

The Holly (Alverson) Woodhouse letter of November 12, 1992, states,[9]

> As a follow-up to my previous letters, I would like to address the 2 main incidences [sic], and one in the library.
>
> In the Diamond Library, early in the 1st few weeks, Mr. Silva, Nikki Libbey, Kate Allen, Kim Austin, & Roger Wadleigh & myself were talking about an assignment. Nikki said "I guess I'll go jump on a Computer before someone else does" in

referring about doing an assigned "search" that Mr. Silva had assigned us. Don Silva smiled & said "I'd like to see that!" We all laughed a bit uneasily & wandered off.[10]

> Same day, I was on the floor in the card indexes looking up books. Don Silva stopped, saw me on my hands & knees pulling out a floor level card index. Kate & Nikki heard him say to me "You look like you've had alot [sic] of experience on your knees." I didn't hear him. Kate & Nikki looked at each other in disbelief and then told me.
>
> In Class on the 24th of Feb he was comparing a belly dancer to a bowl of jello (a jello mold) on a plate with a vibrator held below the plate so it makes the jello jiggle. I felt that was disgusting & unnecessary—he assumed all kids present had experience with vibrators, which I find personally insulting, and I felt the young women, right out of High School, were being seriously degraded.
>
> As for the incident on the 26th Mr. Silva was trying to explain the term "focus" in Technical writing. He said "Let me put this in sexual terms so you all will understand. First you poke around, loosen it up, go from side to side, up & down, until you find just the right spot. That's focus." I remember sitting in my seat, staring at him, then I turned to look at Kate & Kim. We all were looking like we were in shock. I remember slowly looking under my chair as every muscle in my body contracted, to see if he was under my chair. The rest of my reaction is in my 1st letter.
>
> I positively DO NOT want my daughter exposed to this level of teaching, in 4 years when she begins a College Career. I am willing to proceed formally as far as needed to gain some action taken.

Silva Affidavit, Exhibit 19.

Plaintiff responded to the students' complaints and raised his objections to the fairness of the procedures being used by the University in a letter dated November 24,

---

9. The court does not adopt the Woodhouse letter of November 12, 1992, as findings of fact. *See, e.g., infra* note 10.

10. Nicole (Nikki) Libby, the student to whom this comment was directed, testified at the Appeals Boards hearing that she was not offended by Silva's "jump on the computer" remark. *See* Appeals Board Hearing Transcript at 515–17.

1992. Letter from Silva to Lubow (attached to Silva Affidavit as Exhibit 21).

By letter dated December 10, 1992, plaintiff was notified that a hearing panel had been established to consider the sexual harassment complaint filed against him at a hearing scheduled for January 27, 1992. Letter from Chris Burns–DiBiasio [11] to Silva (attached to Silva Affidavit as Exhibit 24). The letter further informed plaintiff that "[t]he function of the hearing panel will be to hear and consider testimony, and other relevant reliable evidence, and to make findings of fact to determine if the University Policy on Sexual Harassment has been violated, and if so, to recommend appropriate sanctions." *Id.* Copies of the UNH policy on sexual harassment and the UNH sexual harassment complaint procedures were enclosed with the letter. *Id.* This letter also listed the two faculty members, two students, and one staff member chosen to sit on the hearing panel and informed plaintiff that he had the right to two preemptive challenges and could challenge any panel member for cause. *Id.* Plaintiff made no specific challenges to any of the panel members, but did voice his objection to the fact that the panel did not include any minority members. Letter from Silva to Burns–DiBiasio dated Dec. 15, 1992 (attached to Silva Deposition as Exhibit 28); Letter from Burns–DiBiasio to Silva dated Dec. 18, 1992 (attached to Silva Deposition as Exhibit 31).

A hearing before the hearing panel was held on January 28, 1993. Professor John Mulhern served as plaintiff's third-party advisor at this hearing. Plaintiff contends that this hearing "involved matters outside the complaints and as to which I had no prior knowledge that they would be used." Silva Affidavit ¶ 26. Specifically, plaintiff asserts that

I was *never* given notice that allegations related to a "time management problem" that I gave as an assignment, the fact that I did not return this problem promptly, the "assignment" in which I asked my students to put down their home and school ad-

dresses and phone numbers, my alleged habit of standing too close to students when speaking, my alleged "confrontation" with Brenda Madonna after the Informal Complaints were filed, and my question to Kate Allen asking her if she wanted an A in the course, would be used against me during the formal proceedings. Similarly, the status of the allegations contained in Ms. Woodhouse's second letter (Ex. 19) was never made clear to me. All of these "facts" were, in fact, used by the complainants at the hearings and were relied upon by both panels.

Silva Affidavit ¶ 24 (footnote omitted).

On February 2, 1993, the hearing panel submitted the following findings of fact [12] to the University's president, Dale Nitzschke.

Based on careful consideration of all evidence presented in the hearing, the panel makes the following findings of fact.

—Professor Silva used two sexually explicit examples in his technical writing class. Specifically, as an example of a "working definition," Professor Silva described belly dancing as being like a plate of jello being stimulated by a vibrator. In another example, Professor used a vivid description of sexual intercourse to describe the "focus stage" of the technical writing process.

—Students were offended and shaken by Professor Silva's remarks and expressed reluctance and fear of going to speak to him directly about their concerns. Instead, they sought help from another faculty member.

—When asked if he (Professor Silva) would use the same examples to illustrate technical writing concepts in the future, he replied he would do it again "tomorrow."

—The students described a number of other encounters with Professor Silva that had sexual overtones and that resulted in students feeling offended, embarrassed and intimidated.

---

11. Burns–DiBiasio is Director of the University's Office of Affirmative Action.

12. The court notes that its recitation of the hearing panel's findings of fact does not indicate any adoption of said findings.

—The students were also intimidated by a classroom assignment that required students to reveal personal information about their daily activities from 6:00 A.M. to 1:00 A.M., including what they did, with whom they did it, as well as what they thought and dreamed about. The assignment was allegedly related to time management, but there was no explanation to the student[s] of the purpose of the assignment or the need for such extensive information.

—Professor Silva requested and kept personal information on all students including home telephone numbers, personal goals and their favorite color, ostensibly for a research project. Students were unaware of any research project and had never signed Informed Consent Forms agreeing to information being accumulated about themselves in this way. Students were uncomfortable about Professor Silva retaining this information and voiced concerns about how it might be used.

—Two alternate sections of the technical writing class were set up mid-semester and instructors hired to accommodate students who no longer felt they could attend Professor Silva's class. Twenty-six students, including the complainants, changed sections when presented with the opportunity.

—Director Brian Giles stated that scheduling a separate class is an extreme measure and an option he has never needed to exercise in his six years as the Director of the Thompson School of Applied Sciences.

—Students who reported their concerns and later filed a complaint said that Professor Silva sought them out and in one incident used himself to physically move in on the students and verbally intimidate them. In another incident, Professor Silva impeded the movement of one of the students. The student, scared and shaken by this encounter, went directly to a faculty member who corroborated the encounter.

—Finally, Dr. Jerilee Zezula and Dr. Brian Giles testified that they had both spoken directly with Professor Silva and told him that his comments had offended the students and were inappropriate.

It is the conclusion of the hearing panel that a reasonable female student would find Professor Silva's comments and his behavior to be offensive, intimidating and contributing to a hostile academic environment. Furthermore, Professor Silva gave the panel no reason to believe that he understood the seriousness of his behavior and the impact it had on the students he was teaching. In addition, Professor Silva stated he would behave in a similar manner in the future.

For these reasons, it is the hearing panel's opinion that Professor J. Donald Silva violated the USNH Sexual Harassment Policy. And since this is the second time in a two-year period that Professor Silva has been formally notified about his use of inappropriate and sexually explicit remarks in the classroom, the hearing panel recommends to the President the following sanctions:

1. Leave without pay for a period of one year. At Director Brian Giles discretion, Professor Silva has been relieved of teaching responsibilities this semester. We support the administration's concern that Professor Silva be kept out of the classroom until it is clear that he poses no risk to students.

We further recommend:

2. That before Professor Silva is allowed to return to the classroom that he satisfy the following additional requirements:

—Reimburse the University for all costs associated with any and all alterations in teaching assignments by Professor Silva's behavior, including, but not limited to, creation of alternate sections.

—Within one month of the receipt of this letter, participate in approved counseling sessions (with a licensed and certified counselor selected by the University of New Hampshire) for a minimum of one year at his own expense;

—Make no attempts to retaliate against those students who have filed sexual harassment complaints against him;

—Apologize in writing to the complainants for creating a hostile and offensive environment.

Sexual Harassment Hearing Board Decision at 2–4 (Exhibit 4 to Defendants' Further Memo).

The findings and recommendations of the panel were then reviewed by Nitzschke. Based on his review, Nitzschke concluded that plaintiff had violated "the USNH Sexual Harassment Policy." Letter from Nitzschke to Silva dated Feb. 8, 1993, at 1 (attached to Silva Deposition as Exhibit 34). Nitzschke also accepted all of the panel's recommended sanctions except for the requirement that plaintiff participate in a minimum of one year of counseling. This condition was altered to require plaintiff to "obtain a counseling evaluation ... and, if prescribed, participate in continued counseling sessions...." *Id.* at 2.

With respect to the decision of the hearing panel, plaintiff states in his affidavit,

In determining the sanction, the first panel relied on the "fact" that I had been previously warned about my use of "inappropriate and sexually explicit remarks in the classroom" (despite the fact that this was not a "past sexual harassment offense" as required by the procedures). No evidence had been received on this prior "warning" and I was given no opportunity to rebut it (being unaware that it was going to be used against me)....

Silva Affidavit ¶ 27.[13]

Plaintiff appealed Nitzschke's decision pursuant to the University's October 1991 Procedures for Resolution of Sexual Harassment Complaints. Letter from Silva to Nitzschke dated Feb. 23, 1993 (attached to Silva Deposition as Exhibit 38). A sexual harassment appeals board made up of two students and three faculty members was put together to hear plaintiff's appeal. Letter from Nitzschke to Silva dated Mar. 4, 1993 (attached to Silva Deposition as Exhibit 40).

Plaintiff was given two preemptory challenges to the individuals selected to serve on the appeals board, but chose not to exercise them. Letter from Burns–DiBiasio to Silva dated Mar. 8, 1993, and Letter from Silva to Burns–DiBiasio dated Mar. 9, 1993 (attached to Silva Deposition as Exhibit 40); Silva Deposition at 202–03.

The appeals board convened on March 29, 1993. The appeals board hearing "began at noon and continued beyond midnight." Silva Affidavit dated Feb. 11, 1994, at ¶ 45. Plaintiff was represented at the hearing by a faculty advisor, Thomas Carnicelli. *Id.* ¶ 29.

Plaintiff describes the appeals board hearing as

highly chaotic at the beginning of the meeting. The students arrived with Italian sandwiches and sodas and Mary Clark opened the meeting and the students immediately began popping their sodas and unwrapping their sandwiches and sat there and proceeded to eat their lunch because the proceedings started at 12:00 noon.

Silva Deposition at 189. He further states,

A. Well, I couldn't understand why each Board would allow the students to whisper with one another and to send signals by winking and nodding their heads and prompting one another, you know, when they were being questioned. And also, you know, signaling Jane Stapleton, you know, and back and forth. I mean, there were seven people sitting there and it was very obvious, you know, that this went on and on and on. And there's the—

Q. Can you be more specific about the behavior that was going on?

A. Well, I can't remember the exact student. Like, for example, when—I remember once when Holly Woodhouse was saying some things in the meeting, she was prompted by one of the other women whose name escapes me right now. I can't

---

**13.** The prior warning referred to in the hearing panel decision involved an incident that occurred in 1990 when Silva paraphrased an Ann Landers column in class. Several students subsequently complained to Giles about Silva's use of sexually explicit stories in the classroom. Giles sent Silva an informal note inquiring about the incident and subsequently met with Silva to discuss what

had happened. *See* Handwritten Note from Giles to Silva dated Feb. 1, 1990 (attached to Silva Deposition as Exhibit 35). Silva was later denied a merit increase in pay, in part because of the 1990 incident. *See* Memo from Giles to Silva dated Aug. 27, 1990, and Memo from Giles to Silva dated June 26, 1990 (attached to Silva Deposition as Exhibit 40).

remember her name. But she said a couple of things out loud and, you know, and prompted her....

Silva Deposition at 190.

Plaintiff also asserts that the hearing's atmosphere made it difficult for him and his advisors to question the students who had filed the complaint against him. Plaintiff states,

A. Well, just generally that the hypersensitivity and the atmosphere was, you know, exceedingly emotional, making it impossible for us to, you know, ask questions.

Q. Why was it impossible for you to ask questions?

A. Because the students wouldn't—the students would—began—would react emotionally and they would look to the Board and they would in essence refuse to answer the questions and any further questions asked would make them even more emotional and than they already were.

Q. It's your testimony that the students refused to answer questions that were asked of them in the hearing?

A. In some cases they did. I can't detail them.

Silva Deposition at 191–92.

Plaintiff also describes two other incidents that occurred at the appeals board hearing which he contends made it impossible for him to get a fair hearing. Plaintiff states,

A. One was when I turned to Carnicelli and, without a voice, in other words, below a whisper, there was a microphone on the table right in front of me, a very sensitive one and with a technician running it, and when one of the students said that it was not your every day household, not every home has Jello or a vibrator, I turned to Carnicelli and said under my breath "Especially Jello."

At this point in the hearing, Jane Stapleton jumped up and said "I heard what he said" and said what it was. It was that—I can't remember, I think she said was he said that Holly Woodhouse should have a vibrator in her house or something. And

immediately three other students jumped up and said that's exactly what they heard. And then Shannon Cannon jumped up on the panel and she said that she heard the same thing. And that was a total disruption of the hearing and seemed to be completely out of control at that point.

Silva Deposition at 193–94.

A. ... And then there was another incident where a student who was ostensibly indisposed stood up in the middle of the hearing looking, you know, very ill, and disconcerted, at the same time that Roger Wadleigh, a student, a friend of hers was testifying, and she walked out of the room and as she walked out of the room she either collapsed and fell to the floor or was beginning to collapse to the floor and one of the other women ran to her and proceeded to hold on to her and they struggled out of the room together and they were gone from the hearing for a length of time. And I'll never forget the looks of the people on the panel. Because they looked at her and then they looked at me as if I had caused, you know, this effect.

Silva Deposition at 197.

The Appeals Board made the following findings of fact[14] in its decision issued on April 14, 1993.

Based on careful consideration of all evidence presented in the hearing, the Appeals Board makes the following findings of fact:

—Professor Silva used at least two inappropriate sexually explicit examples in his technical writing class. Specifically, as an example of a "working definition," Professor Silva described belly dancing like a plate of jello being stimulated by a vibrator. In another example, Professor Silva used a vivid description of sexual intercourse to describe the "focus stage" of the technical writing process. His stated intention was to define "focus" in "terms that [the students could] all understand."

—The students described several other encounters with Professor Silva that were

---

**14.** The court notes that its recitation of the Appeals Board's findings of fact does not indicate any adoption of said findings.

personally invasive, or that had derogatory or sexual overtones. Specifically, he asked one student (Kate Allen) "how would you like to get an A" for the class. Other inappropriate remarks reported by the students included the following:

To Holly Woodhouse, "It looks like you've had a lot of experience down there." This comment was made to Ms. Woodhouse when Professor Silva observed her on her knees looking through the bottom drawer of the card catalog at the UNH Library.

When Nicole Libby told her classmates that she was "going to jump on the computer," Professor Silva commented to other students near him, "I'd like to see that." (This comment was overheard and reported by Kate Allen.)

To Denise Kohler and Jamalyn Brown, "How long have you been together?" implying a lesbian relationship.

In another instance, Kimberly Austin reported overhearing Professor Silva giving a spelling test to a student. According to Ms. Austin, every third example Professor Silva used had a sexual slant. Ms. Austin was waiting in the doorway of Professor Silva's office to see him about a class assignment.

—Several students (J. Brown, R. Ferreira, H. Woodhouse, and especially K. Austin) mentioned Professor Silva's tendency to stand too close to students when he talks to them. This made the complainants uncomfortable and bordered on intimidation. Professor Carnicelli attributed this behavior to Professor Silva's cultural background. The Board found this reason difficult to accept because Professor Silva has been in this country for over 30 years and should understand comfortable conversation distances.

—The students were also alarmed by the instructions given regarding a time management assignment that required the students in the class to record information on a chart about their daily activities from 6:00 A.M. to 1:00 A.M. Professor Silva told the class he wanted to know what they did, with whom they did it, as well as what they thought and dreamed about. The purpose of the assignment was not explained to the students, and the assignment was not returned to them until after Professor Silva was requested to do so by the Director of the Thompson School of Applied Sciences, Brian Giles.

—The students reported feeling offended, intimidated, embarrassed, humiliated, demeaned and threatened by Professor Silva's remarks, and expressed reluctance and fear of going to speak with him directly, one-on-one. At this time, the students had no way to avoid Professor Silva and his offensive behavior. Professor Silva's technical writing class was required for graduation; no other sections were offered at the time. In this situation, they sought help from another faculty member, Dr. Jerilee Zezula, who advised them to file a formal complaint. During the hearing, Dr. Zezula corroborated the students' claim that they were distressed, upset and offended by Professor Silva's behavior.

—Two alternate sections of the technical writing class were set up at mid-semester and instructors hired to accommodate students who no longer felt they could attend and learn in Professor Silva's class. Twenty-six students, including the complainants, changed sections when presented with the opportunity. Director Brian Giles stated that scheduling a separate class is an extreme measure and an option he has never exercised in his six years as Director of the Thompson School of Applied Sciences.

—Students who reported their concerns and later filed a complaint said that Professor Silva sought them out and, in one incident in Stacy's Restaurant (located in the Thompson School), physically moved in on them and argued with them and verbally intimidated them.[15] In another incident reported by one of the witnesses (Brenda Madonna), Professor Silva physically blocked her exit from the vending machine room while he complained about the stu-

---

15. At the preliminary injunction hearing, Silva testified that the Stacy's Restaurant incident did not involve a heated argument, but rather that at said incident he told several students that he had freedom of speech in the classroom, and when they disagreed, he left.

dents' actions against him and how he would overcome this attack. The students, disturbed and shaken by these encounters, went to Dr. Zezula, who corroborated both encounters to the Hearing Board.

—Finally, both Dr. Jerilee Zezula and Dr. Brian Giles testified that they had spoken directly with Professor Silva and told him that his comments were inappropriate and had offended the students. Dr. Giles spoke with Professor Silva twice, and told him not to approach the students against.

It is the conclusion of the Appeals Board that Professor Silva's repeated and sustained comments and behavior of a sexual and otherwise intrusive nature had the effect of creating a hostile and intimidating academic environment. Furthermore, it is the Board's opinion that as an experienced teacher and professor of communication and language, Professor Silva should have been more sensitive to the effect of his behavior on the students. Unfortunately, Professor Silva gave the Board no reason to believe that he understood the seriousness of his behavior and the impact it had on the students. When the problem was brought to his attention, he tried to defend himself by claiming that the students were immature and in need of better training in the use and interpretation of language.

The Board found these women to be reasonable and that they had independently, as well as collectively, been offended by Professor Silva's language and innuendos.

For these reasons, it is the Appeals Board's opinion that Professor J. Donald Silva has violated the USNH Sexual Harassment Policy and, since this is the second time in a two-year period that he has been formally or informally warned about his use of inappropriate and sexually explicit remarks in the classroom, the Appeals Board imposes the following sanctions effective immediately:

1. Professor Silva will be suspended without pay for a period of at least one year. Professors are expected to serve as role models for students and to be sensitive to the needs of their students; in the opinion of the Appeals Board, Professor Silva is not capable of meeting this expectation at this time.

2. Professor Silva must begin counseling sessions at his own expense, with a licensed and certified counselor selected by the University of New Hampshire. Professor Silva's suspended status will be removed after one year, following notification by his counselor that no further sessions are needed and that he is ready to return to the classroom.

3. Professor Silva must make no attempt to contact or retaliate against those students who filed the sexual harassment complaint or testified against him.

Dean Thomas Fairchild and Director Brian Giles will be responsible for implementing these sanctions.

Sexual Harassment Appeals Board Decision (Exhibit 3 to Defendants' Further Memorandum).

### Discussion

#### 1. Preliminary Injunction Standard

In deciding whether to grant a preliminary injunction, a district court must weigh the following four factors: (1) the likelihood of the movant's success on the merits; (2) the potential for irreparable harm to the movant; (3) a balancing of the relevant equities, *i.e.,* "the hardship to the nonmovant if the restrainer issues as contrasted with the hardship to the movant if interim relief is withheld," *Narragansett Indian Tribe v. Guilbert,* 934 F.2d 4, 5 (1st Cir. 1991); and (4) the effect on the public interest of a grant or denial of the injunction.

*Gately v. Commonwealth of Mass.,* 2 F.3d 1221, 1224 (1st Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1832, 128 L.Ed.2d 461 (1994).

■ The *"sine qua non"* of the preliminary injunction test is whether the movant is likely to succeed on the merits. *Weaver v. Henderson,* 984 F.2d 11, 12 (1st Cir.1993).

#### 2. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with

the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P.

When the non-moving party bears the burden of persuasion at trial ... to avoid summary judgment he must make a "showing sufficient to establish the existence of [the] element[s] essential to [his] case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 [106 S.Ct. 2548, 2552, 91 L.Ed.2d 265] (1986). The nonmoving party "may not rest upon mere allegation or denials of his pleading." *LeBlanc [v. Great Am. Ins. Co.],* 6 F.3d [836,] 841 [ (1st Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994) ] (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 [106 S.Ct. 2505, 2514, 91 L.Ed.2d 202] (1986)). Rather, to establish a trial-worthy issue, there must be enough competent evidence "to enable a finding favorable to the non-moving party." *LeBlanc,* 6 F.3d at 841 (citations omitted).

*Lewis v. Gillette Co.,* 22 F.3d 22, 24 (1st Cir.1994).

■ In determining whether summary judgment is appropriate, the court construes the evidence and draws all justifiable inferences in the nonmoving party's favor. *Anderson, supra,* 477 U.S. at 255, 106 S.Ct. at 2513.

*3. The Elements of a Section 1983 Claim*

■ To establish a violation of section 1983, the plaintiff must prove (1) that " 'the conduct complained of' ... deprived the complaining party 'of rights, privileges or immunities secured by the Constitution or laws of the United States' " and (2) that such conduct " 'was committed by a person acting under color of state law' ". *Martinez–Velez v. Simonet,* 919 F.2d 808, 810 (1st Cir.1990) (quoting *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981), *overruled on other grounds, Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); and citing 42 U.S.C. § 1983). The record clearly shows that defendants' conduct, as set forth herein, occurred under color of state law.

*4. First Amendment Claims*

■ To prove a First Amendment violation, the plaintiff must show that (1) his classroom speech was constitutionally protected and (2) the speech was a motivating factor in the decision to discipline him. *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). Thereafter, the defendant must show that it would have acted in the same manner even in the absence of the protected classroom speech. *Id.*

*a. Was the Speech Protected?*
*(1) The Absence-of-Notice Claim*

In *Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967), the Supreme Court stated,

When one must guess what conduct or utterance may lose him his position, one necessarily will "steer far wider of the unlawful zone...." *Speiser v. Randall,* 357 U.S. 513, 526 [78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460] [ (1958) ). For "[t]he threat of sanctions may deter ... almost as potently as the actual application of sanctions." *N.A.A.C.P. v. Button* [371 U.S. 415], 433 [83 S.Ct. 328, 338, 9 L.Ed.2d 405] [ (1963) ]. The danger of that chilling effect upon the exercise of vital First Amendment rights must be guarded against by sensitive tools which clearly inform teachers what is being proscribed.

*Id.* at 604, 87 S.Ct. at 684. Accordingly, the First Circuit requires schools to provide teachers "with notice of what conduct was prohibited." *Ward v. Hickey,* 996 F.2d 448, 452 (1st Cir.1993) (citing *see Keyishian, supra,* 385 U.S. at 604, 87 S.Ct. at 684), stating that a school "is not entitled to retaliate against speech that it never prohibited." *Id.,* 996 F.2d at 453 (citing *cf. Mt. Healthy, supra,* 429 U.S. at 284, 97 S.Ct. at 574).

The relevant inquiry is: based on existing regulations, policies, discussions, and other forms of communication between school administration and teachers, was it reasonable for the school to expect to the teacher to know that [his] conduct was prohibited? *Ward v. Hickey, supra,* 996 F.2d at 454.

■ The evidence before the court demonstrates that the belly dancing statement was

not "of a sexual nature," USNH Sexual Harassment Policy, but rather that the six complainants who were offended by it were under the mistaken impression that the word "vibrator" necessarily connotes a sexual device. This misunderstanding induced said complainants to regard the focus statement as part of an offensive academic environment.

Because the USNH Sexual Harassment Policy does not proscribe verbal conduct not of a sexual nature, Silva's discipline under said policy was erroneous. Accordingly, the court finds and rules that such discipline violated the First Amendment's notice requirement as set forth in *Keyishian, supra.*

### (2) The Reasonableness Claim

In *Mailloux v. Kiley,* 448 F.2d 1242 (1st Cir.1971) (per curiam), the First Circuit stated its test for determining the validity of a government regulation affecting a teacher's classroom speech.

> [F]ree speech does not grant teachers a license to say or write in class whatever they may feel like ... and ... the propriety of regulations or sanctions must depend on such circumstances as *the age and sophistication of the students, the closeness of the relation between the specific technique used and the concededly valid educational objective, and the context and manner of presentation.*
>
> ... [W]e see no substitute for a case-by-case inquiry into whether the legitimate interests of the authorities are demonstrably sufficient to circumscribe a teacher's speech.

*Id.,* 448 F.2d at 1243 (emphasis added).

Subsequently, in *Hazelwood School Dist. v. Kuhlmeier,* 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), the Supreme Court held "that educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are *reasonably related to legitimate pedagogical concerns.*" *Id.* at 273, 108 S.Ct. at 571 (emphasis added).

The *Mailloux* test is consistent with the *Kuhlmeier* requirement that the government regulation be reasonably related to legitimate pedagogical concerns. *Ward v. Hickey, supra,* 996 F.2d at 452–53.

"It stands to reason that whether a regulation is reasonably related to legitimate pedagogical concerns will depend on, among other things, *the age and sophistication of the students, the relationship between teaching method and valid educational objective, and the context and manner of the presentation.*" *Id.* at 453 (citing *Mailloux, supra,* 448 F.2d at 1243) (emphasis added).

The court finds that the USNH Sexual Harassment Policy as applied to classroom speech seeks to address the legitimate pedagogical concern of providing a congenial academic environment.

### (i) Age and Sophistication of the Students

The students at issue in this case are exclusively adult college students. Accordingly, said students are presumed to have possessed the sophistication of adults.

### (ii) Relationship Between Teaching Method and Valid Educational Objective

The court finds that Silva's classroom statements advanced his valid educational objective of conveying certain principles related to the subject matter of his course.

### (iii) Context and Manner of Presentation

The record demonstrates that Silva's classroom statements were made in a professionally appropriate manner as part of a college class lecture.

### (iv) Analysis

The evidence before the court shows that Silva's classroom speech was subject to discipline simply because six adult students found his choice of words to be outrageous. In this regard, the Supreme Court has stated,

> "Outrageousness" in the area of political and social discourse has an inherent subjectiveness about it which would allow a jury to impose liability on the basis of the jurors' tastes or views, or perhaps on the basis of their dislike of a particular expression. An "outrageousness" standard thus runs afoul of our longstanding refusal to

allow damages to be awarded because the speech in question may have an adverse emotional impact on the audience. See *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 910 [102 S.Ct. 3409, 3424, 73 L.Ed.2d 1215] (1982) ("Speech does not lose its protected character ... simply because it may embarrass others or coerce them into action"). And, as we stated in *FCC v. Pacifica Foundation*, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978):

> "[T]he fact that society may find speech offensive is not a sufficient reason for suppressing it...." *Id.* at 745, 98 S.Ct. at 3038.

*Hustler Magazine v. Falwell*, 485 U.S. 46, 55, 108 S.Ct. 876, 881, 99 L.Ed.2d 41 (1987) (holding that the First Amendment prohibits public figures and public officials from recovering for the tort of intentional infliction of emotional distress by reason of publications such as the advertisement parody at issue without showing in addition that the publication contains a false statement of fact which was made with "actual malice"). Further,

> [o]ur Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom. "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American Schools." *Shelton v. Tucker* [364 U.S. 479], 487, 81 S.Ct. 247, 251, 5 L.Ed.2d 231 [ (1960) ]. The classroom is peculiarly the "marketplace of ideas." The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth "out of a multitude of tongues, [rather] than through any kind of authoritative selection." *United States v. Associated Press*, 52 F.Supp. 362, 372 [ (D.N.Y.1943) ]. In *Sweezy v. New Hampshire*, 354 U.S. [234,] 250 [77 S.Ct. 1203, 1211, 1 L.Ed.2d 1311] ( [1957] ), we said:
>
>> The essentiality of freedom in the community of American universities is almost self-evident. No one should underestimate the vital role in a democracy that is played by those who guide and train our youth. To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation.... Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die.
>
> *Keyishian v. Board of Regents, supra*, 385 U.S. at 603, 87 S.Ct. at 683–84.

In light of the foregoing, and recognizing that "academic freedom [is not] a license for uncontrolled expression at variance with established curricular contents and internally destructive of the proper functioning of the institution," *Clark v. Holmes*, 474 F.2d 928, 931 (7th Cir.1972), *cert. denied*, 411 U.S. 972, 93 S.Ct. 2148, 36 L.Ed.2d 695 (1973), the court concludes that the USNH Sexual Harassment Policy as applied to Silva's classroom speech is not *reasonably* related to the legitimate pedagogical purpose of providing a congenial academic environment because it employs an impermissibly subjective standard that fails to take into account the nation's interest in academic freedom.

Accordingly, the court finds and rules that the application of the USNH Sexual Harassment Policy to Silva's classroom statements violates the First Amendment.

### (3) The Connick v. Myers Claim

Under *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), a court determines whether a public employee's expression is protected by the First Amendment, by " 'seek[ing] a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.' " *Connick, supra*, 461 U.S. at 142, 103 S.Ct. at 1687 (quoting *Pickering v. Board of Educ.*,

391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968)).[16]

### (i) Matters of Public Concern

Defendants argue that under *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), Silva's classroom speech is unprotected by the First Amendment because it is not related to any "matter of public concern." The court disagrees.

In *Connick*, the Supreme Court addressed the scope of the First Amendment protection as follows. "When the employee expression cannot be fairly considered as relating to any matter of *political, social, or other concern to the community*, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Connick, supra*, 461 U.S. at 146, 103 S.Ct. at 1689 (emphasis added). Further, "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters *only of personal interest*, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick, supra*, 461 U.S. at 147, 103 S.Ct. at 1690 (emphasis added).[17]

"Whether an employee's speech addresses a matter of public concern must be determined by the *content, form, and context* of a given statement, as revealed by the whole record." [18] *Id.* at 147–48, 103 S.Ct. at 1690 (emphasis added).

■ It is a fundamental tenet of First Amendment jurisprudence that the preservation of academic freedom is a matter of public concern. *E.g., Keyishian v. Board of Regents, supra*, 385 U.S. 589, 87 S.Ct. 675; *Sweezy v. New Hampshire, supra*, 354 U.S. 234, 77 S.Ct. 1203.

■ Further, the issue of whether speech which is offensive to a particular class of individuals should be tolerated in American schools is a matter of public concern. *See, e.g.,* Alicia Di Rado, *Student–Written Anti–Hate Speech Bill Presented; Legislation:*

---

**16.** The First Circuit does not apply the *Connick–Pickering* test to determine whether a public school teacher's classroom speech is protected under the First Amendment. *See Ward v. Hickey, supra* (applying *Mailloux, supra; Kuhlmeier, supra; and Keyishian, supra*, but citing neither *Connick, supra*, nor *Pickering, supra* ). Further, in *Miles v. Denver Public Schools*, 944 F.2d 773 (10th Cir.1991), the Tenth Circuit adopted the *Kuhlmeier* standard, *id.* at 775–77; *accord Bishop v. Aronov*, 926 F.2d 1066 (11th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3026, 120 L.Ed.2d 897 (1992); and specifically declined to apply "the *Pickering* test" on the basis that "it does not address the significant interests of the state as educator." *Id.* at 777.

To the contrary, in *Blum v. Schlegel*, 18 F.3d 1005 (2d Cir.1994), the Second Circuit applied the *Connick–Pickering* test while clearly demonstrating that said test does not by its terms fail to address the significant interests of the state as education. *See id.* at 1012 (court considers effect of challenged law school's conduct on its "efficient provision of services" in determining whether disciplinary action against professor violated First Amendment). Additionally, the court notes that, as a public employee, Silva falls within the literal ambit of the *Connick–Pickering* test. *Connick, supra*, 461 U.S. at 142, 103 S.Ct. at 1687. However, because the *Connick–Pickering* test as applied *infra* is consistent with the First Circuit's approach, this court does not resolve the issue of whether the *Connick–Pickering* test is applicable to the instant case.

**17.** In addition to speech upon matters only of personal interest, the Court identified as constitutionally unprotected speech that "falls into one of the narrow and well-defined classes of expression which carries so little social value, such as obscenity, that the State can prohibit and punish such expression by all persons in its jurisdiction." *Connick, supra*, 461 U.S. at 147, 103 S.Ct. at 1690 (citing *Chaplinsky v. New Hampshire*, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942); *Roth v. United States*, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957); *New York v. Ferber*, 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982)). Clearly, the speech at issue involved neither "fighting words," *Chaplinsky, supra*, nor obscenity, *Roth, supra; Ferber, supra*. Nor does said speech fall within the unprotected class of speech that is defamatory. *Beauharnais v. Illinois*, 343 U.S. 250, 72 S.Ct. 725, 96 L.Ed. 919 (1952).

**18.** The Supreme Court recently noted that it has "never set forth a general test to determine ... what categories of speech are so lacking in value that they fall outside the protection of the First Amendment," *Waters v. Churchill*, —— U.S. ——, 114 S.Ct. 1878, 1885, 128 L.Ed.2d 686 (1994), stating that such questions are to be answered "on a case-by-case basis." *Id.* at ——, 114 S.Ct. at 1886.

*Recent O.C. Graduates Tell Senate Panel That Racist Comments at School Prompted Them to Try to Change the Law. But Legislators Send it to be Reworded,* L.A. TIMES, June 30, 1994, Metro Section, Part B at 4, Column 1; Edward Walsh, *Sexual Ethics in the Seminary; A Professor's Biblical Discourse Collides with Correctness,* WASHINGTON POST, May 13, 1994, Style Section at D1; Dirk Johnson, *A Sexual Harassment Case to Test Academic Freedom,* THE NEW YORK TIMES, May 11, 1994, Education Page, Section D at 23, Column 1; *Universities Find Dilemma in Racial Slurring; Freedom of Speech or Verbal Assault,* THE ATLANTA JOURNAL AND CONSTITUTION, Nov. 21, 1991, Features Section at C7; Dennis Cauchon, *Harassment, Free Speech Collide in Florida,* USA TODAY, Nov. 20, 1991, News Section at 9A; Charles M. Madigan, *Time to End Harassment, Hill Says,* CHICAGO TRIBUNE, Nov. 16, 1991, News Section at 3C; *Problem Professor,* THE WASHINGTON POST, Nov. 6, 1991, Opinion Editorial at A24; Betty Dietz, *Committee Boosts Free Speech,* GANNETT NEWS SERVICE, Aug. 20, 1991; *Free Speech and the Campuses,* WASHINGTON POST, May 16, 1993, Opinion Editorial at C6; *Speech Code Silliness,* WASHINGTON POST, May 12, 1993, Opinion Editorial at C6; Burl Osbourne, *If Offensive Speech is Silenced, then Debate is Censored,* ST. PETERSBURG TIMES, July 20, 1992, Editorial Section at 7A; Nat Hentoff, *Speech Codes That Punish Speech,* WASHINGTON POST, March 28, 1992, Editorial Section at A21; *WARNING This Editorial is not Politically Correct,* NEWSDAY, Currents Section, Cover Editorial at 35; Richard Prince, *Impact of Political Correctness,* GANNETT NEWS SERVICE, April 19, 1991; Anthony Flint, *Speech Codes on Campus Stir Debate over Rights,* BOSTON GLOBE, Mar. 31, 1991, National/Foreign Section at 1; *Freedom to Speak, Freedom to Hate,* ST. LOUIS POST-DISPATCH, Mar. 22, 1991, Editorial at 2C; Kenneth J. Cooper, *Speech Code at Issue in Brown Case; University's Move to Expel Student Raises Legal Questions,* WASHINGTON POST, Feb. 13, 1991, First Section at A4; Phil Gailey, *Campus Speech and the First Amendment,* ST. PETERSBURG TIMES, Feb. 18, 1990, Perspective Section at 5D; Margaret Anne Gallagher, *A Tyranny of Pity; Freedom of Speech in College Campuses,* NATIONAL REVIEW, Sept. 26, 1986, Vol. 38, at 28.

█ The evidence before the court demonstrates that Silva's classroom statements were not statements "upon matters only of personal interest," but rather were made for the legitimate pedagogical, *public* purpose of conveying certain principles related to the subject matter of his course. Further, the content, form, and context of said statements demonstrate that they are directly related to (1) the preservation of academic freedom and (2) the issue of whether speech which is offensive to a particular class of individuals should be tolerated in American schools. Accordingly, the court finds and rules that Silva's classroom statements were related to matters of public concern.

### (ii) The Balancing Test

█ Because, as stated *supra,* (1) the USNH Sexual Harassment Policy as applied to Silva's classroom speech employs an impermissibly subjective standard that fails to take into account the nation's interest in academic freedom and (2) said policy was erroneously applied in this case, the court finds that under the *Connick-Pickering* balancing test Silva's First Amendment interest in the speech at issue is overwhelmingly superior to UNH's interest in proscribing said speech.[19]

Accordingly, the court finds and rules that under the *Connick-Pickering* balancing test Silva's classroom statements were protected against UNH disciplinary action by the First Amendment.

### b. Was the Speech a Motivating Factor in the Decision to Discipline Silva?

The evidence before the court clearly demonstrates that but for Silva's classroom statements he would not have been subject to UNH discipline. Accordingly, the court finds and rules that (1) Silva's classroom

---

**19.** The court considers that each of the above-stated grounds is independently sufficient to justify this finding.

statements constituted a motivating factor in the decision to discipline him and (2) defendants would not have acted in the same manner in the absence of said statements.

The court finds and rules that plaintiff is likely to succeed on the merits of his First Amendment claims. For the same reasons, the court herewith denies defendants' motion for summary judgment as to plaintiff's First Amendment claims.

### 5. Procedural Due Process

The Due Process Clause of the Fourteenth Amendment "provides that certain substantive rights—life, liberty, and property—cannot be deprived except pursuant to constitutionally adequate procedures." *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 541, 105 S.Ct. 1487, 1492, 84 L.Ed.2d 494 (1985). To succeed on his procedural due process claim, Silva must show that he had a property or liberty interest in his employment as a tenured professor and that defendants, acting under color of state law,[20] deprived him of that interest without due process. *Id.* at 538, 105 S.Ct. at 1487.

#### a. Existence of a Protected Property or Liberty Interest

■ The Supreme Court has made clear that " 'property' interests subject to procedural due process protection are not limited by a few rigid, technical forms. Rather, 'property' denotes a broad range of interests that are secured by 'existing rules or understandings.' " *Perry v. Sindermann,* 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972) (quoting *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972)).

The court finds and rules that plaintiff, as a tenured professor at UNH, has a property interest in his continued employment.

A person's liberty interests are implicated where the person's " 'good name, reputation, honor, or integrity is at stake because of what the government is doing to him.' "

*Board of Regents v. Roth, supra,* 408 U.S. at 573, 92 S.Ct. at 2707 (quoting *Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971)). *See also Winegar v. Des Moines Indep. Community School Dist.,* 20 F.3d 895, 899 (8th Cir.1994) ("An employee's liberty interests are implicated where the employer levels accusations at the employee that are so damaging as to make it difficult or impossible for the employee to escape the stigma of those charges.").

■ Plaintiff was charged with violating the University's sexual harassment policy. The court finds and rules that such a charge implicates plaintiff's liberty interests in his good name and reputation because the charge of sexual harassment and the subsequent sanctions imposed by defendants "might seriously damage his standing and associations in his community." *Roth, supra,* 408 U.S. at 573, 92 S.Ct. at 2707.

#### b. The Deprivations

As a result of the sexual harassment charges made by several of his students, Silva was subject to the following disciplinary actions: (1) the creation of "shadow classes," taught by other professors, into which students from his technical writing class could transfer during the 1992 spring semester; (2) the issuance of a formal letter of reprimand on April 1, 1992; (3) a suspension without pay from June 2, 1992, until June 22, 1992;[21] (4) a "suspension" from teaching classes during the 1992 fall semester and the 1993 spring semester, with pay; and (5) a one-year suspension from teaching without pay in April 1993, with return dependent upon the fulfillment of several conditions including counseling.

The Due Process Clause protects against the removal or significant alteration of an individual's liberty or property interests without due process of law. *Paul v. Davis,* 424 U.S. 693, 711, 96 S.Ct. 1155, 1165, 47 L.Ed.2d 405 (1976). *See also NCAA v. Tar-*

---

**20.** The record clearly establishes that the defendants in this action were acting under color of state law.

**21.** The court notes that plaintiff did not actually lose any pay or benefits as a result of the June 1992 suspension. *See* Silva Deposition at 109–11.

*kanian,* 488 U.S. 179, 192, 109 S.Ct. 454, 462, 102 L.Ed.2d 469 (1988) (when a state university "decides to impose a serious disciplinary sanction upon one of its tenured employees, it must comply with the terms of the Due Process Clause of the Fourteenth Amendment to the Federal Constitution").

The court finds and rules that Silva's April 1993 suspension without pay from his position as a tenured professor, which remains in effect today, implicates property and liberty interests entitled to constitutional protection. The court further finds and rules that the earlier disciplinary sanctions, as described above, are, in the aggregate, a more than de minimis deprivation of plaintiff's property and liberty interests in his employment as a tenured professor at UNH. *See, e.g., Newman v. Burgin,* 930 F.2d 955, 959 (1st Cir. 1991) (state university's decision to publicly censure tenured professor and bar her from administrative positions for a five-year period treated as a deprivation of liberty or property); *Lowe v. Scott,* 959 F.2d 323 (1st Cir. 1992) (limitation on physician's license to practice medicine amounts to a deprivation of the physician's protected property interest in the license); *Winegar v. Des Moines Indep. School Dist., supra,* 20 F.3d 895 (four-day suspension without pay and punitive transfer treated as more than de minimis deprivations of teacher's property and liberty interests); *Levin v. Harleston,* 770 F.Supp. 895 (S.D.N.Y.1991) (state university creation of shadow classes treated as a deprivation of tenured professor's protected liberty or property interests), *aff'd in relevant part,* 966 F.2d 85 (2d Cir.1992).

■ The court finds and rules that Silva was entitled to the protections of procedural due process before the defendant University significantly altered his employment status in the manner described herein.

*c. What Process is Due*

■ "Once it is determined that due process applies, the question remains what process is due." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). "Due process, which may be said to mean fair procedure, is not a fixed or rigid concept, but, rather, is a flexible standard which varies depending upon the nature of the interest affected, and the circumstances of the deprivation." *Gorman v. University of Rhode Island,* 837 F.2d 7, 12 (1st Cir. 1988). *See also Morrissey v. Brewer, supra,* 408 U.S. at 481, 92 S.Ct. at 2600 ("due process is flexible and calls for such procedural protections as the particular situation demands").

■ "When a procedural due process claim is advanced, the proper focus must be on the manner in which the state has acted: 'how and when' the alleged deprivation was effected." *Amsden v. Moran,* 904 F.2d 748, 753 (1st Cir.1990), *cert. denied,* 498 U.S. 1041, 111 S.Ct. 713, 112 L.Ed.2d 702 (1991). "Whether the deprivation ... was itself erroneous is beside the procedural due process point." *Id.*

Due process requires that "a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Loudermill, supra,* 470 U.S. at 542, 105 S.Ct. at 1493 (quoting *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 656, 94 L.Ed. 865 (1950)); *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965) (due process requires that a plaintiff receive adequate notice and an opportunity to be heard "at a meaningful time and in a meaningful manner"). "The hearing, to be fair in the due process sense, implies that the person adversely affected was afforded the opportunity to respond, explain, and defend. Whether the hearing was fair depends upon the nature of the interest affected and all of the circumstances of the particular case." *Gorman, supra,* 837 F.2d at 13.

■ "The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Loudermill, supra,* 470 U.S. at 546, 105 S.Ct. at 1495. "Beyond the right to notice and hearing, the span of procedural protections required to ensure fairness becomes uncertain, and must be determined by a careful weighing or balancing of the competing interests implicated in the

particular case." *Gorman, supra,* 837 F.2d at 14 (citing *Mathews v. Eldridge,* 424 U.S. 319, 334–35, 96 S.Ct. 893, 902–03, 47 L.Ed.2d 18 (1976)).

"In determining whether due process has been denied, the courts have had to ascertain the scope of the protection required in a particular setting, as well as an 'accommodation of the competing interests involved.'" *Id.* (quoting *Goss v. Lopez,* 419 U.S. 565, 579, 95 S.Ct. 729, 738, 42 L.Ed.2d 725 (1975)). The three competing interests which must be weighed have been identified by the Supreme Court as follows:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest, through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge, supra,* 424 U.S. at 335, 96 S.Ct. at 903.

### d. Was the Process Silva Received "Due Process"?

The process Silva received occurred in two stages. First, in March of 1992, Silva went through what the parties refer to as the "informal" sexual harassment procedures. Following this process, the University created shadow classes for Silva's technical writing course, issued him a formal letter of reprimand, and did not schedule Silva to teach classes during the fall 1992 and spring 1993 semesters. Second, beginning in November 1992, and extending through April 1993, plaintiff went through what the parties refer to as the "formal" sexual harassment procedures. Following this process, plaintiff was suspended from teaching without pay for a one-year period, with his return dependent upon fulfillment of several conditions, including counseling.

In determining whether Silva is likely to succeed on the merits of his procedural due process claim, the court examines each set of procedures and the disciplinary actions that resulted therefrom separately in order to determine whether the process plaintiff received was adequate under the circumstances.

### (1) The "Informal" Sexual Harassment Procedures

Plaintiff asserts that he was not given adequate notice of the charges of sexual harassment made against him or an adequate opportunity to respond to these charges before defendants created shadow classes, issued the April 1, 1992, formal letter of reprimand, and refused to schedule him to teach classes during the 1992–93 school year. Plaintiff maintains that the only process he received prior to these deprivations was the March 3, 1992, meeting with Lubow, Giles, and Stapleton.

Silva states that he "had been given no notice of what the [March 3] meeting would be about," but was "generally cognizant that students had been complaining about [his] classes." Silva Affidavit ¶ 5. However, Ludwig Balling, one of Silva's faculty advisors, states in his affidavit that he "understood" that the March 3 meeting "was being held to discuss complaints of sexual harassment made against Professor Silva by some students in his technical writing class." Balling Affidavit at 1–2 (Plaintiff's Attachments at Exhibit 15). Silva admitted at the preliminary injunction hearing that Balling's statement was true.

At the March 3 meeting, Silva was given copies of the written student complaints. Silva states that after being presented with the written complaints he was immediately asked to respond to the allegations made therein. Silva Affidavit ¶ 6. He maintains the he was "given *no* time to consider my response, *no* opportunity to explain the context in which the statements had been made, and *no* opportunity to explain why the statements did not constitute sexual harassment under the University's policy." *Id.* (emphasis in original).

The affidavits of Deborah Watson and Ludwig Balling, plaintiff's advisors, provide similar descriptions of the March 3 meeting. Watson states that at the March 3 meeting

"the students' charges were presented to Don for the first time and he was expected to answer them, although he scarcely had time to read them." Watson Affidavit at 2 (Plaintiff's Attachments at Exhibit 14). Similarly, Balling states,

At the outset of the meeting, photocopies of the students' handwritten complaints were presented to Professor Silva, Professor Watson and myself. As soon as all three of us had finished reading these complaints, Associate Vice President Lubow asked Professor Silva to respond to them. Professor Silva was not offered any time to consider his response or to confer with me or Professor Watson prior to responding.

Balling Affidavit at 2.

Two shadow classes were created following the March 3 meeting. The court finds that Lubow and Giles discussed replacing plaintiff with alternative class instructors prior to that meeting. *See* Lubow Deposition at 25–26; Giles Deposition at 33–34. The court further finds that Balling suggested at the March 3 meeting that an alternate section of plaintiff's course be set up when he learned that the University was considering suspending plaintiff from teaching. *See* Balling Affidavit at 4–5.

A second meeting between Silva, Watson, and Balling and Lubow, Giles, and Stapleton was held on March 27, 1992. At this meeting, which Silva describes as "very short" and involving "little discussion," Silva was given a draft copy of the letter of reprimand. Silva Affidavit ¶ 9. Further, Silva was given until April 1, 1992, to respond to the letter and the conditions of employment listed therein.[22] On April 1, 1992, after Silva had failed to respond to the draft letter, defendants issued the draft letter as a formal letter of reprimand. Silva was subsequently suspended for failure to comply with two of the four conditions of employment set forth in said letter.

Silva grieved the University's issuance of the formal letter of reprimand through the University's six-step grievance process. Silva's suspension was placed into abeyance pending the outcome of this process. Further, as a result of the University's decision to initiate the formal sexual harassment procedures, the formal letter of reprimand was rescinded. At the same time, however, Silva was notified that the University would not be scheduling him to teach any classes during the pendency of the formal sexual harassment process.

Due process requires that the defendant University provide Silva with " 'notice and an opportunity for hearing appropriate to the nature of the case' " before depriving him of the property and liberty interests he has in his tenured position at UNH. *Loudermill, supra*, 470 U.S. at 542, 105 S.Ct. at 1493 (quoting *Mullane, supra*, 339 U.S. at 313, 70 S.Ct. at 656). Whether the hearing Silva received on March 3, 1992, and March 27, 1992, was "fair in the due process sense . . . depends upon the nature of the interest affected and all of the circumstances of the particular case." *Gorman, supra*, 837 F.2d at 13.

■ The court finds and rules that plaintiff received adequate notice prior to the March 3 meeting that the purpose of said meeting was to address complaints of sexual harassment that had been made by several of his students. The court further finds and rules that Silva received adequate notice of the sexual harassment charges against him when he was presented copies of the written student complaints at the March 3 meeting and given an opportunity to read them. In addition, the court finds and rules that plaintiff was given an opportunity to respond to the charges against him at the March 3 meeting.

Subsequent to the March 3 meeting, shadow classes were created into which students from Silva's technical writing course could transfer, the formal letter of reprimand was issued, and Silva was not scheduled to teach classes during the 1992–93 school year. However, Silva was permitted to continue teaching during the 1992 spring semester, the formal letter of reprimand was rescinded,

---

**22.** Silva requested an extension of time to respond to the letter, but that request was denied by Lubow.

and he continued to receive his full pay and benefits throughout the time period in question.

In light of the limited nature of the deprivations that followed the process Silva received during the "informal" sexual harassment hearings, the court finds and rules that said process was constitutionally adequate. Defendant's motion for summary judgment as to plaintiff's procedural due process claim is granted insofar as that claim challenges the adequacy of the "informal" sexual harassment procedures.

### (2) The "Formal" Sexual Harassment Process

The "formal" sexual harassment procedures in this case encompass the January 1993 hearing before the hearing panel and the March 1993 hearing before the appeals board. Silva asserts that his April 1993 suspension without pay violates his procedural due process rights because he was not given adequate notice of the charges against him prior to the hearings. He further asserts that the hearings were not fair in the due process sense because of the bias of the decisionmakers, the delay between the time at which the students first made their complaints and the time of the hearings, and the failure of the University to follow its own procedures.

### (i) Delay and Failure to Follow University Procedures

▆ Plaintiff contends that the University's failure to follow its own procedures and the delay before the formal sexual harassment hearings in January and March of 1993 violated his due process rights. However, the Due Process Clause "does not require the University to follow any specific set of detailed procedures so long as the procedures the University actually follows are basically fair ones...." *Newman v. Burgin, supra,* 930 F.2d at 960. The court therefore finds and rules that the University's purported failure to follow its own procedures does not constitute a violation of Silva's procedural due process rights.

▆ The court further finds and rules that the delay between the time of the students' initial complaints in February and March of 1992 and the formal sexual harassment hearings in January and March of 1993 does not amount to a violation of plaintiff's due process rights. *See, e.g., Loudermill, supra,* 470 U.S. at 546–47, 105 S.Ct. at 1495–96.

### (ii) Notice of Charges and Opportunity to Respond

Plaintiff states in his affidavit that,

throughout the time of the "formal proceedings, I *repeatedly* asked (as did my advisors) for a clarification of the charges that had been levelled against me. I was told simply to look at the "complaints," which I understood to be the original Informal Complaints written by the students (since there had been no Formal Complaints). I was thus affirmatively misled into believing that the hearings would *not* address charges outside those Informal Complaints.

Silva Affidavit ¶ 23 (emphasis in original). Plaintiff further states, "I was certainly *never* told that the second-hand allegations in Dr. Zezula's report would be used against me in the *formal* proceedings. Quite the contrary. I was told to concern myself only with student-written complaints." *Id.* n. 3 (emphasis in original).

Plaintiff asserts that numerous issues raised in the hearings and used as grounds to suspend him without pay were not set forth in the student complaints to which he was referred. Specifically, Silva states,

I was *never* given notice that allegations related to a "time management problem" that I gave as an assignment, the fact that I did not return this problem promptly, the "assignment" in which I asked my students to put down their home and school addresses and phone numbers, my alleged habit of standing too close to students when speaking, my alleged "confrontation" with Brenda Madonna after the Informal Complaints were filed, and my question to Kate Allen asking her if she wanted an A in the course, would be used against me during the formal proceedings. Similarly,

the status of the allegations contained in Ms. Woodhouse's second letter (Ex. 19) was never made clear to me. All of these "facts" were, in fact, used by the complainants at the hearings and were relied upon by both panels.

*Id.* ¶ 24 (emphasis in original) (footnote omitted).

In a detailed letter dated April 15, 1992, Silva refuted the charges against him, including his question to Kate Allen about whether she wanted an A in his course. Letter from Silva to Giles (attached to Silva Affidavit as Exhibit 22). *See also* Letter from Silva to Giles dated April 30, 1992 (attached to Silva Deposition as Exhibit 7). Further, the "time management problem," Silva's request that students provide him with home and school addresses and telephone numbers, and Silva's alleged confrontation with Brenda Madonna, were all referred to in the decision issued by the hearing panel. Silva received a copy of said decision and appealed it to the Appeals Board, which held a de novo hearing on the question of whether Silva violated the University's sexual harassment policy.

In addition, the decision of the Appeals Board relies, in part, on the board's finding that "this is the second time in a two-year period that he [Silva] has been formally or informally warned about his use of inappropriate and sexually explicit remarks in the classroom...." Appeals Board Decision at 4 (attached to Defendant's Further Memo as Exhibit 3). Silva contends that he had no notice that the Appeals Board would be considering a 1990 incident, in which several students from one of Silva's classes had complained to Brian Giles about some statements made by Silva in the classroom, as a "past sexual harassment offense." Silva explains in his affidavit that this "prior offense" consisted of his "paraphrasing from an Ann Landers column." Silva Affidavit ¶ 27.[23] At the preliminary injunction hearing, Neil Lubow testified that when Silva described to him the contents of said column, he, Lubow, laughed.

Silva maintains that he "was not formally or informally warned" by Giles as a result of the 1990 incident. Silva Deposition at 209.

However, following the 1990 incident, Silva did receive an informal note from Giles about student complaints and subsequently met with Giles to discuss those complaints. *See* Note from Giles to Silva dated Feb. 1, 1990 (attached to Silva Deposition as Exhibit 35). Silva also concedes that he was denied a merit increase, in part because of the 1990 incident.

Silva further maintains that no evidence regarding the 1990 incident was presented during the hearing before the Appeals Board and that he had no opportunity to respond or explain that incident at the hearing. Silva Affidavit ¶ 30. However, Silva admitted at the preliminary injunction hearing that he had raised the 1990 incident with Zezula during their telephone conversation in February of 1992 and that the incident was discussed during the March 3, 1992, hearing. Further, both the April 1, 1992, formal letter of reprimand and the hearing panel decision make reference to the 1990 incident.

Professor Thomas A. Carnicelli, who served as Silva's third-party advisor at the hearing before the Appeals Board, states in his affidavit that "[n]o evidence regarding any such previous incident was submitted to the Appeals Board. Professor Silva never had any notice of such charges or opportunity to challenge the facts offered in support thereof." Affidavit of Thomas A. Carnicelli at ¶ 10 (attached to Plaintiff's Memorandum of Law in Opposition to Summary Judgment).

The court finds and rules that plaintiff received notice that the hearings in January and March of 1993 would address the question of whether his conduct, as described in the student complaints, violated the University's sexual harassment policy.

However, on the basis of the evidence before it, the court further finds that a genuine issue of material fact exists as to whether Silva received adequate notice that incidents not mentioned in the student complaints and incidents upon which no evidence was presented at the hearings would be considered by the hearing panel and appeals

---

**23.** A copy of said column is attached to Silva's Deposition as Exhibit 37.

board in their determination of whether his conduct constituted sexual harassment.

### (iii) Bias of the Decisionmakers

"[A]n impartial and independent adjudicator 'is a fundamental ingredient of procedural due process.'" *Gorman, supra,* 837 F.2d at 15 (quoting *Gorman v. University of R.I.,* 646 F.Supp. 799, 810 (D.R.I.1986)). "[A] plaintiff alleging impartiality must overcome the presumption that administrators are 'men of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances,' and must demonstrate an actual risk of bias or prejudgment." *Brasslett v. Cota,* 761 F.2d 827, 837 (1st Cir.1985) (quoting *Withrow v. Larkin,* 421 U.S. 35, 56, 95 S.Ct. 1456, 1469, 43 L.Ed.2d 712 (1975) (quoting *United States v. Morgan,* 313 U.S. 409, 421, 61 S.Ct. 999, 1004, 85 L.Ed. 1429 (1941))). *Accord Gorman, supra,* 837 F.2d at 15. Accordingly, the alleged bias of the decisionmakers in such proceedings "'must be based on more than mere speculation and tenuous inferences.'" *Gorman, supra,* 837 F.2d at 15 (quoting *Duke v. North Texas State Univ.,* 469 F.2d 829, 834 (5th Cir.1972), *cert. denied,* 412 U.S. 932, 93 S.Ct. 2760, 37 L.Ed.2d 160 (1973)).

"[T]he probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable" in situations where "the adjudicator has a pecuniary interest in the outcome" or where the adjudicator "has been the target of personal abuse or criticism from the party before him." *Withrow v. Larkin, supra,* 421 U.S. at 47, 95 S.Ct. at 1464 (citations omitted).

Further, a decisionmaker is not disqualified "simply because he has taken a position, even in public, on a policy issue related to the dispute, in the absence of a showing that he is not 'capable of judging a particular controversy fairly on the basis of its own circumstances.'" *Hortonville Joint School Dist. No. 1 v. Hortonville Educ. Ass'n,* 426 U.S. 482, 493, 96 S.Ct. 2308, 2314, 49 L.Ed.2d 1 (1976) (quoting *United States v. Morgan,* 313 U.S. 409, 421, 61 S.Ct. 999, 1004, 85 L.Ed. 1429 (1941)).

### Involvement of Chris Burns–DiBiasio

■ Plaintiff contends that Chris Burns–DiBiasio's involvement in the formal sexual harassment proceedings tainted that process because she was biased against him.

The evidence before the court shows that Burns–DiBiasio was the University official responsible for coordinating the formal sexual harassment proceedings, including appointing the people who sat on both the hearing panel and the appeals board.

Further, Burns–DiBiasio testified at her deposition that she sat in on the deliberations of both the hearing panel and the appeals board and drafted their decisions. Burns–DiBiasio Deposition at 119, 156 (Plaintiff's Attachments at Exhibit 10). In their affidavits, Appeals Board members Fink, Dolan, Cannon, Denning, and Clark each state that Burns–DiBiasio took "detailed notes" during the board's deliberations and wrote several draft decisions for the board. Said drafts were circulated and edited by the board members. Affidavits of Appeals Board Members (attached to Defendants' Further Memorandum as Exhibit 10). The board members further state that their signatures on the April 14, 1993, decision indicate that the decision is an accurate summary of the reasons for their finding that Silva violated the University's Sexual Harassment Policy. *See id.* Finally, each of the Appeals Board members indicates in his or her affidavit that Burns–DiBiasio acted as a "neutral procedural advisor" to the board and "never voiced an opinion about Professor Silva or the merits of his case." *Id.*

The court finds that the evidence before it is insufficient to support a finding that Chris Burns–DiBiasio was biased against Silva or that her involvement in the formal sexual harassment procedures tainted that process.

### The Appeals Board

Silva contends that the Appeals Board was biased because of several incidents that occurred during the Appeals Board hearing involving one of the board's members, Shannon Cannon.

The first incident involves the outburst that occurred over a statement Silva whis-

pered to his advisor during the testimony of Holly Woodhouse during the appeals board hearing. This incident, described *infra* at 309, resulted in outbursts by Jane Stapleton, three students, and Appeals Board Member Shannon Cannon. Silva states that these outbursts resulted in "a total disruption of the hearing." Silva Deposition at 194.

When asked about this incident at her deposition, Cannon stated,

> I was very shocked first of all because he hadn't said anything the whole hearing and I would think that something like that wouldn't necessarily portray the image that he would want to be portraying at that time, you know. I think that it just clearly, it clearly reaffirmed what I thought he was hoping to disprove.

Cannon Deposition at 122 (attached to Defendants' Reply to Plaintiff's Memorandum at Exhibit 2).

The second incident occurred during a break in the hearing. Cannon asserts that during this break Silva followed her to the telephone and waited nearby while she made a telephone call. Following this alleged incident, Cannon seated herself farther away from plaintiff for the remainder of the hearing. Cannon stated at her deposition,

> After our dinner break, because I felt uncomfortable sitting across from Professor Silva knowing that he knew that I had heard during the outburst that he knew that I had heard whatever I thought he had said, and because of the incident with the coke machine and the coke machine room I felt uncomfortable, and so Liz Dolan and I switched seats. . . .

Cannon Deposition at 175. Silva testified at the preliminary injunction hearing that he went to the men's room during the break and then returned to the hearing room, but denies following Cannon during the break in the hearing. *See also* Silva Affidavit ¶ 29, n. 5.

Silva contends that Cannon's outburst, in addition to her assertion that plaintiff followed her during a break in the hearing and the fact that she switched seats with another board member in order to be seated farther away from Silva for the remainder of the

hearing, demonstrate that Cannon was biased. Silva further contends that these incidents tainted the fairness of the entire hearing.

With regard to her objectivity in this matter, Cannon stated at her deposition,

> I feel that I was able to look at the information that we were being given in the best manner that I could. I don't feel—I don't feel that my decision or what happened to me influenced my decision. If what I had heard from him as well as the complainants had convinced me that this was not sexual harassment, yet this had still happened to me, I would have still felt it was not sexual harassment. So I feel like the actions, although they did not influence my decision, they would not have swayed me either way. It would not have swayed me either way, but it was yet another incident in my mind to simply something that confirmed what these women were saying, their feeling of intimidation.

Cannon Deposition at 178–79.

■ The court finds and rules that the evidence shows that Cannon was not capable of judging the controversy before her on the basis of its own circumstances. The court further finds that there exists a genuine issue of material fact as to whether the bias of Cannon compromised the impartiality and independence of the Appeals Board on which she sat so that Silva was not afforded a fair hearing.

In light of the court's finding that a genuine issue of material fact exists as to (1) whether defendants failed to give plaintiff adequate notice of the charges against him before or during the formal sexual harassment proceedings and (2) whether the bias of Appeals Board Member Shannon Cannon compromised the impartiality and independence of the Appeals Board, the court denies defendants' motion for summary judgment on plaintiff's procedural due process claim insofar as that claim challenges the adequacy of the "formal" sexual harassment procedure.

However, the court finds and rules that, while Silva has shown that a genuine issue exists as to whether his procedural due pro-

cess rights have been violated, the evidence before the court is insufficient for a finding that plaintiff is likely to succeed on the merits of said claim.

*6. Substantive Due Process*

In contrast to a procedural due process claim,

> a substantive due process claim implicates the essence of state action rather than its modalities; such a claim rests not on perceived procedural deficiencies but on the idea that the government's conduct, regardless of procedural swaddling, was in itself impermissible.

*Amsden v. Moran, supra,* 904 F.2d at 753. *See also Pittsley v. Warish,* 927 F.2d 3, 6 (1st Cir.) (substantive due process "imposes limits on what a state may do regardless of what procedural protection is provided"), *cert. denied,* 502 U.S. 879, 112 S.Ct. 226, 116 L.Ed.2d 183 (1991).

> [S]ubstantive due process protects individuals against state actions which are "arbitrary and capricious," *Newman [v. Commonwealth of Mass.],* 884 F.2d [19,] 25 [ (1st Cir.1989), *cert. denied,* 493 U.S. 1078, 110 S.Ct. 1132, 107 L.Ed.2d 1037 (1990) ], or those which run counter to "the concept of ordered liberty," *Palko v. Connecticut,* 302 U.S. 319, 325 [58 S.Ct. 149, 152, 82 L.Ed. 288] (1937), or those which, in context, appear "shocking or violative of universal standards of decency," *Furtado v. Bishop,* 604 F.2d 80, 95 (1st Cir.1979) (footnote omitted), *cert. denied,* 444 U.S. 1035 [100 S.Ct. 710, 62 L.Ed.2d 672] (1980).

*Amsden v. Moran, supra,* 904 F.2d at 753–54.

■ It is "clearly established" in the First Circuit "that school authorities who make an arbitrary and capricious decision significantly affecting a tenured teacher's employment status are liable for a substantive due process violation." *Newman v. Commonwealth of Mass.,* 884 F.2d 19, 25 (1st Cir.1989), *cert. denied,* 493 U.S. 1078, 110 S.Ct. 1132, 107 L.Ed.2d 1037 (1990).

■ A decision affecting a tenured teacher's employment status is arbitrary and capricious "if the stated reason for the action was 'trivial, or is unrelated to the education

process . . . or is wholly unsupported by a basis in fact.' " *Id.* at 24 (quoting *McEnteggart v. Cataldo,* 451 F.2d 1109, 1111 (1st Cir.1971)), *cert. denied,* 408 U.S. 943, 92 S.Ct. 2878, 33 L.Ed.2d 767 (1972). However, "where *stated* reasons adequately support an adverse personnel action, that action is not 'arbitrary,' whether or not a plaintiff might demonstrate a further 'real' *unstated* and arbitrary reason for the action." *Newman v. Burgin, supra,* 930 F.2d at 963. "A contrary holding would unduly inhibit administrative decision making, for it would permit endless exploration of a decision maker's 'true' state of mind in instances where perfectly good reasons exist for taking an administrative action." *Id.*

Plaintiff contends that the Appeals Board's determination that his conduct constituted "sexual harassment" under the University's Sexual Harassment Policy was arbitrary and without any basis in fact because no one could reasonably characterize his conduct as sexual in nature. Thus, the crux of plaintiff's substantive due process claim is the same as the absence-of-notice component of his First Amendment claim—that he was disciplined for making certain statements in his classroom that were not sexual in nature.

■ The Supreme Court has held, as recently as this past term, that "[w]here a particular amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.' " *Albright v. Oliver,* — U.S. —, —, 114 S.Ct. 807, 813, 127 L.Ed.2d 114 (1994) (quoting *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989)); *see also Albright,* — U.S. at —, 114 S.Ct. at 810 (Souter, J., concurring) (recognizing that the Supreme Court "has resisted against relying on the Due Process Clause when doing so would have duplicated protection that a more specific constitutional provision already bestowed"). The court finds and rules that the essence of Silva's substantive due process claim is the same as his First Amendment claim. The court fur-

ther rules that because the First Amendment provides an explicit textual source of constitutional protection against the government behavior challenged by Silva, his claim is best analyzed under the First Amendment rather than under the more generalized notion of substantive due process. The court therefore grants summary judgment as to Silva's substantive due process claim.

### 7. Irreparable Harm

In order to obtain preliminary injunctive relief, in addition to showing a likelihood of success on the merits, Silva must establish that he will suffer irreparable harm if injunctive relief is not granted.

Silva, who has taught at UNH since 1963 and has been a tenured professor there since 1968, was suspended without pay in April of 1993. This suspension without pay remains in effect.

■ As previously set forth in this order, the court has found that Silva is likely to succeed on the merits of his First Amendment claim. It is well established that "[t]he loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976). *See also Mariani Giron v. Acevedo Ruiz,* 834 F.2d 238, 239 (1st Cir. 1987) (irreparable harm in the absence of relief exists when an employee's First Amendment rights are violated by his firing). Thus, in the context of the First Amendment, finding a likelihood of success on the merits is coextensive with finding irreparable harm. Further, the University's suspension of Silva

without pay, which remains in effect, constitutes an independent basis for finding that Silva has been and continues to be irreparably harmed in this case.

The court finds and rules that Silva has suffered and will continue to suffer irreparable harm if preliminary injunctive relief is not granted.[24]

### 8. Balance of the Relevant Equities and the Public Interest

The final factors the court must weigh in determining whether Silva is entitled to preliminary injunctive relief are

a balancing of the relevant equities, *i.e.,* "the hardship to the nonmovant if the restrainer issues as contrasted with the hardship to the movant if interim relief is withheld," *Narragansett Indian Tribe v. Guilbert,* 934 F.2d 4, 5 (1st Cir.1991); and ... the effect on the public interest of a grant or denial of the injunction.

*Gately, supra,* 2 F.3d at 1224.

■ Plaintiff seeks a preliminary injunction enjoining the University from continuing its suspension of him and reinstating him to his position as a tenured professor at UNH. Balancing the hardship to UNH if the restrainer issues[25] against the hardship to Silva if interim relief is withheld, the court finds that the hardship to Silva far outweighs the hardship to UNH. The court further finds that the public interest in this matter is best served by the protection of Silva's constitutional rights.

Having considered and weighed all of the relevant factors, the court finds and rules

---

24. Defendants contend that Silva's claim of irreparable harm is barred by the doctrine of laches. However, the court finds and rules that plaintiff's delay in seeking preliminary injunctive relief was not so unreasonable as to make the defense of laches available without a clear showing of prejudice. *See Murphy v. Timberlane Regional School Dist.,* 973 F.2d 13, 16 (1st Cir. 1992). The court finds and rules that the defendant University has failed to make such a showing.

Defendants further contend that Silva is collaterally estopped from claiming irreparable harm because of the Strafford County Superior Court's determination, in August of 1992, that Silva was not entitled to injunctive relief. However, that

request for injunctive relief was made by Silva before he was suspended without pay in April of 1993. Accordingly, the court finds that the issue before this court is not the same as the issue before the state superior court, *see NLRB v. Donna–Lee Sportswear Co.,* 836 F.2d 31, 34 (1st Cir. 1987), and rules that collateral estoppel does not bar Silva's claim for preliminary injunctive relief.

25. UNH maintains that the relief sought by Silva would be "disruptive and extremely burdensome" because teaching assignments for the current semester were made months ago, and students have already registered and begun classes. *See* Defendant's Objection to Plaintiff's Motion for Preliminary Injunction at 18, 26.

that plaintiff is entitled to preliminary injunctive relief.

### 9. Qualified Immunity

The individual defendants in this action assert that they are entitled to qualified immunity from damages as to plaintiff's First Amendment and due process claims.

 The affirmative defense of qualified immunity shields government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). In other words,

> whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the "objective legal reasonableness" of the action, *Harlow*, 457 U.S., at 819 [102 S.Ct., at 2739], assessed in light of the legal rules that were "clearly established" at the time it was taken, *id.*, at 818 [102 S.Ct., at 2738].

*Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987).

"To be 'clearly established,' the 'contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Quintero de Quintero v. Aponte–Roque*, 974 F.2d 226, 228 (1st Cir.1992) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)). "This is not to say that an official action in question has previously been held unlawful, see *Mitchell [v. Forsyth]*, [472 U.S. 511,] 535 n. 12 [105 S.Ct. 2806, 2820 n. 12, 86 L.Ed.2d 411] [ (1985) ]; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton, supra*, 483 U.S. at 640, 107 S.Ct. at 3039.

"If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow v. Fitzgerald, supra*, 457 U.S. at 818–19, 102 S.Ct. at 2738.

When a government official being sued in his or her individual capacity moves for summary judgment on the basis of qualified immunity, " 'the relevant question is whether a reasonable official would have believed his actions were lawful in light of clearly established law and the information the official possessed at the time of his allegedly unlawful conduct.' " *Febus–Rodriguez v. Betancourt–Lebron*, 14 F.3d 87, 91 (1st Cir.1994) (quoting *McBride v. Taylor*, 924 F.2d 386, 389 (1st Cir.1991)).

Plaintiff's First Amendment and Fourteenth Amendment due process claims are based on conduct of the defendants that occurred between March of 1992 and April of 1993. Therefore, under *Harlow v. Fitzgerald, supra*, and *Anderson v. Creighton, supra*, if the law governing Silva's First and Fourteenth Amendment claims was clearly established prior to March 1992, then defendants Nitzschke, Giles, Lubow, Clark, Dolan, Fink, Cannon, and Denning are not entitled to qualified immunity.

#### a. The First Amendment Claims

To support its ruling that plaintiff has shown a likelihood of success on the merits of his First Amendment claims, the court relies on the following authority, all of which was effective prior to March of 1992: *Keyishian v. Board of Regents*, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Hustler Magazine v. Falwell*, 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1987); *Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988); and *Mailloux v. Kiley*, 448 F.2d 1242 (1st Cir.1971).[26]

---

**26.** In asserting their defense of qualified immunity, defendants make much of the fact that the First Circuit's decision in *Ward v. Hickey*, 996 F.2d 448 (1st Cir.1993), which is referred to by the court in section 4.a. of this order, was decided on June 15, 1993, a full two months after the Appeals Board issued its decision. However, the First Circuit's decision in *Ward v. Hickey* is based on the Supreme Court's decisions in *Mt. Healthy, supra, Keyishian, supra,* and *Hazelwood, supra,* and on the First Circuit's 1971 decision in *Mailloux, supra.* It is the law set forth in these cases,

■ The court finds and rules that the law governing Silva's First Amendment claims, as described in section 4 of this order, was clearly established at the time of defendants' conduct and that a reasonable University official would not have believed his or her actions, in disciplining plaintiff because of his classroom statements, were lawful in light of this clearly established law. The court therefore finds and rules that the individual defendants are not entitled to qualified immunity as to plaintiff's First Amendment claims.

### b. The Procedural Due Process Claim

In denying defendant's motion for summary judgment as to Silva's Fourteenth Amendment procedural due process claim insofar as said claim challenges the "formal" sexual harassment procedures, the court relies on the following authority: *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Gorman v. University of Rhode Island,* 837 F.2d 7 (1st Cir.1988); and *Amsden v. Moran,* 904 F.2d 748 (1st Cir.1990), *cert. denied,* 498 U.S. 1041, 111 S.Ct. 713, 112 L.Ed.2d 702 (1991).

■ The court finds and rules that at the time defendants Clark, Dolan, Fink, Cannon, Denning, and Nitzschke acted it was clearly established that a tenured public employee who faces disciplinary action "up to and including dismissal," USNH Sexual Harassment Policy, is entitled to the protections of procedural due process. It was also clearly established prior to the time period in question that plaintiff's procedural due process rights included the right to adequate notice of the charges against him, an explanation of the University's evidence, and an opportunity to present his side of the story, *Loudermill, supra,* 470 U.S. at 546, 105 S.Ct. at 1495, as

well as the right to an impartial and independent adjudicator, *Gorman, supra,* 837 F.2d at 15. The court therefore finds that defendants Clark, Dolan, Fink, Cannon, Denning, and Nitzschke are not entitled to qualified immunity as to Silva's remaining procedural due process claim.

### 10. Volunteer Immunity

The individual defendants contend they are immune from liability for plaintiff's claims under New Hampshire Revised Statutes Annotated (RSA) 508:17 (Supp.1993), which states, in relevant part,

I. Any volunteer of a nonprofit organization or government entity shall be immune from civil liability in any action brought on the basis of any act or omission resulting in damage or injury to any person if:

(a) The volunteer had prior written approval from the organization to act on behalf of the organization; and

(b) the volunteer was acting in good faith and within the scope of his official functions and duties with the organization; and

(c) The damage or injury was not caused by willful, wanton, or grossly negligent misconduct by the volunteer.

RSA 508:17 has not yet been interpreted by the New Hampshire Supreme Court. "When interpreting a state statute that has not been construed by the state courts, the federal court is to apply the same principles of statutory construction that would be used by the state courts." *FDIC v. Caia,* 830 F.Supp. 60, 64 (D.N.H.1993) (citing *Thomas v. Reliance Ins. Co.,* 617 F.2d 122, 125 (5th Cir.1980)). The New Hampshire Supreme Court has repeatedly held that it will not "construe a statute as unconstitutional where it is susceptible of a constitutional construction. . . ." *State v. Johnson,* 134 N.H. 570, 576, 595 A.2d 498, 502 (1991) (citing *White v. Lee,* 124 N.H. 69, 77–78, 470 A.2d 849, 854 (1983)).

■ "[S]tate law that immunizes government conduct otherwise subject to suit

not *Ward v. Hickey,* that clearly establishes the contours of plaintiff's First Amendment rights.

under § 1983 is preempted" by the Supremacy Clause of the federal constitution. *Felder v. Casey,* 487 U.S. 131, 138–39, 108 S.Ct. 2302, 2306–07, 101 L.Ed.2d 123 (1988). Accordingly, the court interprets RSA 508:17 as granting volunteers immunity from civil liability for claims brought under state law, but not for claims brought under federal law. The court therefore finds that the individual defendants are not immune from civil liability for plaintiff's federal constitutional claims under RSA 508:17.

### 11. State Law Contract Claims

#### a. Count III—Breach of Contract Against the Individual Defendants

█ In Count III, Silva alleges that the actions of all defendants, individually and collectively, in relation to their handling of the sexual harassment allegations against plaintiff constitutes a breach of the collective bargaining agreement between the USNH Board of Trustees and the UNH Chapter of the American Association of University Professors (the AAUP Contract). Defendants move for summary judgment on said claim, contending that a breach of contract claim may not be maintained against the individual defendants because they were not parties to the AAUP Contract.

The first page of the AAUP Contract states that the agreement is between the USNH Board of Trustees and the AAUP–UNH Chapter. *See* AAUP Contract (attached to Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment as Exhibit 2). Further, numerous provisions throughout the AAUP Contract reflect that the parties to the contract are the University and the AAUP–UNH Chapter. *Id.*

The court finds that the evidence before it is insufficient for a finding that the individual defendants in their individual capacities were parties to the AAUP contract. The court grants defendants' motion for summary judg-

ment as to Count III insofar as it alleges a breach of contract claim against the individual defendants in their individual capacities.

#### b. Count IV—Breach of Contract Against the University

In Count IV, Silva alleges that the AAUP Contract and the Faculty Handbook "constitute a substantial portion of the contractual obligations which the University owes to Silva as a tenured member of the faculty." Complaint ¶ 76. Silva contends, inter alia, that the University breached its contractual obligations to him when it (1) failed to protect its faculty's right to academic freedom in violation of Article 2 of the AAUP contract, and (2) failed to follow the grievance procedures set forth in both documents in violation of Article 4.5 and Article 9 of the AAUP contract and Chapter VI of the Faculty Handbook. *Id.* ¶ 77.[27]

##### (1) Academic Freedom

Article 2 of the AAUP Contract establishes the parties' "continuing commitment to the principles of academic freedom and its protections as provided in the AAUP Statement of Principles of Academic Freedom." AAUP Contract, Article 2, § 2.1. That statement provides, inter alia,

> Academic freedom in its teaching aspect is fundamental for the protection of the rights of the teacher in teaching and of the student to freedom in learning. It carries with it duties correlative with rights.... The teacher is entitled to freedom in the classroom in discussing his/her subject, but he/she should be careful not to introduce into his/her teaching controversial matter which has no relation to his/her subject.

1940 Statement of Principles on Academic Freedom and Tenure (attached to Faculty Handbook as Appendix A).

Plaintiff offers the affidavit of William Van Alstyne[28] as evidence that the University

---

**27.** Plaintiff makes a plethora of arguments in his numerous memoranda to establish that there has been a breach of his employment contract with the University. The court's review of plaintiff's arguments reveals that he is essentially arguing that defendants breached that contract by failing

to follow established procedures and by violating plaintiff's right to academic freedom. The court therefore limits its discussion on Count IV to those central issues.

**28.** Van Alstyne is a professor at Duke Law School and is "a former general counsel, former

breached their contractual commitment to academic freedom. Van Alstyne states, inter alia,

Academic freedom, as it is generally understood in the University Community, encompasses rights of faculty to speak freely outside the classroom, to pursue research and to publish freely outside of the classroom, and to teach in the classroom without unreasonable interference.... At a minimum, this concept of academic freedom permits faculty members freedom to choose specific pedagogic techniques or examples to convey the lesson they are trying to impart to their students.

Van Alstyne Affidavit ¶ 3.

██ In light of the court's ruling that plaintiff has shown a likelihood of success on the merits of his First Amendment claims, the court finds that the evidence before it is sufficient to support a finding that the defendant University breached the academic freedom provisions of the AAUP Contract.

### (2) Grievance Procedures

#### (i) AAUP Contract

Article 4.5 of the AAUP Contract states, inter alia,

The University and the bargaining unit members will make every effort to maintain a professional academic environment that is free of intimidation and harassment of members of the University community. Allegations of sexual harassment will be addressed through the existing UNH sexual harassment policies and procedures or as modified by mutual agreement. Any disciplinary action resulting from this process may be appealed through the grievance procedure.

Article 9 details the procedure an individual should follow to file a grievance alleging "a misinterpretation, misapplication, or violation of a provision(s) of this Agreement or any policy incorporated by reference into this Agreement." Article 9.2.1.

Silva alleges that the University anticipatorily breached these provisions when it noti-

fied him by letter that the Sexual Harassment Appeals Board decision was "final," thereby deterring plaintiff from appealing this decision through the grievance procedure.

Defendants contend that the AAUP contract expressly stated that plaintiff had a right to grieve said decision, and it was plaintiff who failed to pursue the grievance. In support thereof, defendants point to Silva's deposition, wherein he stated that if it was his choice whether to have the appeals board decision reviewed internally or in court, he felt going to court would resolve the problem quicker. Silva Deposition at 213–16.

In his affidavit, Silva states, inter alia,

The appeals panel decision was accompanied by a letter dated April 14, 1993 in which the members of the appeals panel characterized their decision as the "final decision" on this complaint. It was clear to me that "final" meant, as stated in the procedures I had been given, that I would have to go outside the University to obtain relief.

Silva Affidavit ¶ 31.

██ On the basis of the evidence before it, the court finds that a genuine issue of material fact exists as to whether the defendant University breached the grievance provisions of the AAUP contract.

#### (ii) Faculty Handbook: The Six-Step Grievance Process

Chapter VI of the Faculty Handbook sets forth the grievance procedures which are to be followed in the event of a "grievable act." A grievable act is defined to include "any specific University action(s) which allegedly: a) violates, misinterprets, or inequitably applies any provisions of the Faculty Handbook; [or] b) abrogates or denies a faculty member's academic freedom...." Faculty Handbook, Chapter VI (attached to Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment as Exhibit 1). The Faculty Handbook contains

national president, and former chair of national committee A (on Academic Freedom and Tenure) of the American Association of University Profes-

sors." Affidavit of William Van Alstyne ¶ 1 (attached to Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment).

a six-step grievance process by which a grievable act may be challenged. *Id.*

Silva initiated the six-step grievance process detailed in Chapter VI of the Faculty Handbook after receiving the formal letter of reprimand dated April 1, 1992. Silva contends that the University breached the contractual grievance procedures when Walter Eggers failed to hear his grievance at Step IV and when President Nitzschke refused to call a hearing board pursuant to Step V.

Defendants contend that there was no breach of contract because it was plaintiff's failure to pursue a grievance against Eggers' decision, and not the actions of Eggers and Nitzschke, that caused the grievance process to end.

Eggers notified Silva by letter dated November 13, 1992, that he would not hear Silva's grievance because the formal letter of reprimand issued by Brian Giles, which was the subject matter of the grievance, had been rescinded. *See* Letter from Eggers to Silva (attached to Silva Affidavit as Exhibit 15 and to Silva Deposition as Exhibit 22). Silva, not satisfied with Eggers' decision, requested that President Nitzschke hear his grievance at Step V. *See* Letter from Nitzschke to Silva dated Nov. 25, 1992 (attached to Silva's Affidavit as Exhibit 16). Silva further states that when he appealed to Step V, Nitzschke "characterized Eggers' decision as an 'administrative action.' Accordingly, Nitzschke refused to call the Hearing Board required at Step V of the hearing process." Silva Affidavit ¶ 18. The University maintains that the next step in the grievance procedures was for Silva to grieve Eggers' decision at Step IV rather than to initiate Step V. *See* Letter from Nitzschke to Silva dated Dec. 17, 1992 (attached to Silva Affidavit as Exhibit 16).

■ The court finds that the evidence before it is sufficient for a finding that the University breached its employment contract with Silva by failing to follow the six-step grievance process detailed in Chapter VI of the Faculty Handbook.

### (iii) Faculty Handbook: Sexual Harassment Procedures

Chapter VI of the Faculty Handbook states that in cases of sexual harassment every effort should be made to resolve the claim on an informal basis. *See* Faculty Handbook, Chapter VI at 19–20. Mediation should take place for 30 days and, if no resolution has occurred, then the formal grievance procedure may be initiated. *Id.* at 20. This action "must be taken no later than 10 working days from the date of the cessation of the 30–day mediation period." *Id.*

Silva states in his affidavit, as evidence that the informal discussions to resolve the matter were not pursued by the University, that while "the complainants were willing to accept an apology from me if I were willing to listen to why my words made them feel uncomfortable[,]" the University told him that "an apology would *not* be sufficient...." Silva Affidavit ¶ 10.

Silva further contends that the University failed to follow the formal grievance procedures in that no formal complaints were filed, the Hearing Panel was not properly selected and trained, and the scope of the hearings was not limited to the complaints. *See* Silva Affidavit at 9–13 *and* Faculty Handbook, Chapter VI, "Student Grievance Procedures" at 18–19.

The court finds that the evidence before it is sufficient to support a finding that the defendant University breached its employment contract with Silva by failing to follow the grievance procedures set forth in Chapter VI of the Faculty Handbook.

In light of the above findings, the court denies defendants' motion for summary judgment as to Count IV.

### c. Count V—Breach of Duty of Good Faith and Fair Dealing

In Count V, Silva alleges that defendants breached their duty of good faith and fair dealing owed to Silva "by acting willfully and without legitimate justification by, among other things; wrongfully and without justification refusing to afford Silva fair process in his grievance proceeding." Complaint ¶ 81.

■ "Under New Hampshire law, every contract contains an implied covenant of good faith performance and fair dealing." *Reno-*

*vest Co. v. Hodges Development Corp.*, 135 N.H. 72, 81, 600 A.2d 448, 454 (1991) (citing *Seaward Constr. Co. v. Rochester*, 118 N.H. 128, 129, 383 A.2d 707, 708 (1978)). Courts "have relied on such an implied duty in three distinct categories of contract cases—those dealing with standards of conduct in contract formation, with termination of at-will employment contracts, and with limits on discretion in contractual performance...." *Centronics Corp. v. Genicom Corp.*, 132 N.H. 133, 139, 562 A.2d 187, 190 (1989).

Defendants move for summary judgment as to Count V on the ground that the covenant of good faith and fair dealing does not apply in this case because no discretion is left to the University in performing its obligations under the contract.

■ After reviewing the provisions of the AAUP Contract and the Faculty Handbook, the court finds that the evidence before it is sufficient for a finding that the University utilized discretion throughout the grievance process pursuant to both contracts. Defendants' motion for summary judgment as to Count V is denied.

### Conclusion

For the reasons set forth herein, the court grants plaintiff's motion for a preliminary injunction (document 31). The defendant University is herewith ordered to reinstate J. Donald Silva to his position as a tenured professor, with full pay and benefits, and is enjoined from continuing its suspension of Silva from teaching at UNH pending a determination on the merits of his constitutional claims. In accordance with this order, the University shall make all necessary arrangements to return Silva to the classroom for the current semester.

In so ordering, the court recognizes that there are difficulties posed by returning Silva to the classroom during a semester that is already in progress, but notes that the University has already demonstrated its ability to handle such a situation by creating alternative sections to classes and allowing students the opportunity to transfer into said sections.

Defendants' motion for summary judgment (document 3) is denied as to Count I, granted in part and denied in part as to Count II, granted as to Count III insofar as it alleges a breach of contract claim against the individual defendants in their individual capacities, and denied as to Counts IV and V.

SO ORDERED.